VANCE, Circuit Judge.
This is a review by direct appeal of judgments of conviction and sentence following jury verdicts of guilty of Thomas Andrew Gandolfo and Harry Maran Ritter. Defendants were convicted on both counts of a two-count indictment of armed robbery of a federal savings and loan association in violation of 18 U.S.C. § 2113(a) and (d). Each was sentenced under the second count only to imprisonment for 15 years. We affirm as to Gandolfo. As to Ritter, we reverse with directions to dismiss the indictment.
Because our holding centers on its sufficiency, a detailed examination of the evidence is required.
THE FACTS
On August 29, 1975 the Naples Federal Savings and Loan in Bonita Springs, Florida was robbed of $4,291 by two male Caucasians wearing black knitted ski masks and gloves. One of the men was of “medium build” and wearing camouflagic pants, a shirt and carrying a blue automatic handgun. The other was “heavy-set,” “stocky,” with “very large arms,” wearing a camou-flagic jumpsuit and carrying a double-barreled, side-by-side shotgun.
The two men entered the “bank” at between 9:28 and 9:30 A.M. As the man carrying the pistol entered he said: “This is a hold-up. Don’t anybody move” or words to that effect. He directed the tellers to fill pillowcases with their money and then vaulted over the tellers’ counter and went through the money drawers himself. The man carrying the shotgun dropped his weapon as he entered. After retrieving his shotgun, he went to the manager’s office and directed the branch manager, Mr. Starr, to come out of his office. Witnesses reported that each time the shotgun was pointed at him, Mr. Starr would raise his hands up over his head.
Mr. Starr had been able to activate the silent alarm which notified the police and set the cameras into operation. Pictures taken by the automatic cameras during the robbery clearly show the two robbers. Both were wearing ski masks, tennis shoes and gloves. Both appeared to be of medium height. One carried an automatic pistol, wore a dark shirt over what appears to be camouflagic trousers and was of medium weight. The other carried a sawed-off shotgun, wore a camouflagic coverall and was somewhat heavier.
The robbery was completed within a few minutes and the robbers sped off in a Chevrolet Chevelle automobile, which had been reported stolen just prior to the robbery. Within an hour after the robbery the vehicle was discovered approximately one and one-half to two miles from the savings and loan. An examination revealed that the entire cylinder door lock mechanism was missing from the passenger door.
*957 Prior to the August 29 robbery Gandolfo had significant contacts with several individuals who were witnesses at trial.
In January, 1975 Gandolfo met with one Neal Branch in a lounge in Fort Meyers, Florida, and informed Branch that he (Gan-dolfo) was a bank robber. Shortly thereafter he told Branch that he was going to “do a number” and wanted Branch to “pick him up” in Bonita Springs.[1] Branch testified that some five weeks after their initial meeting, Gandolfo introduced him to a Harry Ritter, but he could not identify Ritter in the courtroom. On that day Gandolfo showed Branch an A.R.15 gun, a shotgun with a barrel about 24 inches long, some greenish, spotted jumpsuits, roll-down dark ski masks, and some brown cotton work gloves, all of which were in the trunk of his car. Ritter was not shown to be present at this viewing. During one of several meetings thereafter, Branch and Gandolfo discussed the different ways of stealing an automobile. One such way was by “punching the lock out of the door” and “getting keys made.”
In early August, 1975, Gandolfo introduced Ritter as his partner to Harold “Boots” Whidden. A week or two later he and Ritter went by Whidden’s house and Gandolfo asked Whidden if he would drive a car in a bank robbery. With Ritter present Gandolfo showed Whidden a gun, and some green or grey coveralls, which were in the trunk of a car.
On August 28, 1975, the day before this bank robbery, Gandolfo met with a Thomas Brantley. On that date he offered Brantley $10,000 (for what the record is not clear). Brantley asked Gandolfo where he would get that kind of money. Gandolfo replied that he was going to rob a bank.
On or about that same date, a white male had the A-l Lock and Key Shop in Naples, Florida make a key for a General Motors car door lock which he had in his possession. The locksmith could not identify either Gandolfo or Ritter, but described the man for whom the key was made as “five feet eight inches to five feet ten inches, light brown or brown hair, and of medium build.”
Also, on the 28th of August a man registered for two persons at the Fort Meyers Beach Holiday Inn. The party of two checked in under the name of Harry Ritter, checked out on the 29th at approximately 8:33 A.M. and re-registered at the motel at 10:05 A.M. They subsequently checked out on the 30th at 5:38 A.M.. Ritter could not be identified in the courtroom by the motel clerk but was described by the clerk as “five feet ten inches to six feet, average build, with sandy colored hair.”
An F.B.I agent investigating the robbery determined that it was 13.2 miles from the savings and loan association to the Holiday Inn and that the distance could be trav-elled, with a stop at the point where the stolen car was dropped off, in 20 minutes.
A Mr. Shera testified that in late August, 1975, he encountered Mr. Gandolfo, whom he had known previously, in the lounge of the same Holiday Inn. With Gandolfo was a man who was introduced by Gandolfo as Harry Ritter. Shera could not identify Rit-ter in the courtroom.
On September 9, 1975, following the robbery, Gandolfo told an F.B.I. agent that he knew who had committed the robbery, that the car was stolen by removing the lock mechanism from the door, and that if he were to rob a bank, he would wear “jumpsuits, ski masks and gloves; select a bank in an isolated area; and would ‘hole up’ in a room or apartment for a day or two” following the robbery.
Beginning in September, 1975, Gandolfo and Ritter lived for almost two months in an apartment with a Christine Audrey Stewart and an Ava Cooper in Charleston, South Carolina. In late September, Gan-dolfo told Mrs. Stewart about a bank robbery in Florida in which his shotgun fell “apart when he walked in the door of the bank.” His story of the robbery also in- *958 eluded his telling Mrs. Stewart that while he was in the bank a man “kept putting his hands up and down,” that he had a “partner,” and that he sawed off the barrel of a shotgun at a motel in Florida.
Gandolfo related the same story to Mrs. Stewart’s boyfriend, Kenneth Ducker. During October, 1975, Ducker saw Gandolfo in possession of two different weapons, a pistol and a sawed-off shotgun. In late October, 1975, unknown to Gandolfo, Duck-er took the shotgun, concealed it from him, and later gave it to the F.B.I. The shotgun was identified as one purchased by a Kathy E. Scully on December 18, 1974. Scully was a former girlfriend of Gandolfo.
It was stipulated that Ritter had been receiving unemployment payments from March 1,1975 through August 30,1975. On September 5, 1975 Ritter contacted a Mr. Wroblewski, a Fort Meyers bail bondsman, and paid Wroblewski $1,250 in cash, to secure the release, on bail, of Kathy Scully.
THE EVIDENCE AGAINST RITTER
In deciding the sufficiency of the evidence on appeal, we must consider the evidence in the light most favorable to the government. Glasser v. U. S., 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942).
The test by which we must measure the sufficiency of the evidence is established:
[I]n criminal cases based on circumstantial evidence our task is to determine whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused’s innocence. [W]hether the evidence be direct or circumstantial, the matter of the defendant’s guilt is for the jury to decide unless the court concludes that the jury must necessarily have had a reasonable doubt. United States v. Warner, 441 F.2d 821, 825 (5th Cir. 1971)
To affirm Ritter’s conviction we need only conclude “that reasonable minds could have found the evidence to be inconsistent with the hypothesis” of his innocence. United States v. Duckett, 550 F.2d 1027 (5th Cir. 1977). The circumstantial proof must be susceptible of inferences from which the jury might reasonably have found guilt beyond a reasonable doubt. United States v. Martinez, 486 F.2d 15 (5th Cir. 1973). Statement of the controlling principles is somewhat less difficult than their application. Our responsibility ultimately dictates that we examine the record not to determine what we consider reasonable, but, rather, to determine what the jury might reasonably have concluded. In so doing it is necessary in this case that we undertake to isolate the evidence against each defendant. The narrow question with respect to Ritter is whether his identity was proved. On that issue the evidence showed:
1. Gandolfo discussed the robbery with Neal Branch in the presence of a man introduced to Branch as Harry Ritter. Branch could not identify Ritter in the courtroom.
2. Gandolfo introduced Ritter to “Boots” Whidden as his partner and with Ritter present showed Whidden a gun and some coveralls in the trunk of a car. Whidden was able to point out Ritter in court.
3. On the day before the robbery a man using the name Harry Ritter, and whose general description fit Ritter, checked in for a party of two at a motel within 20 minutes driving distance of the savings and loan. The motel clerk did not identify Ritter in court. A witness saw Gandolfo at the motel in the company of a man Gandolfo introduced to the witness as Harry Ritter but the witness could not identify Ritter in court.
4. A man who matched Ritter’s general description had a General Motors automobile key made just prior to the robbery. The description was so general, however, that it would fit a substantial portion of the male population of the country.
5. After the robbery Ritter was in Charleston, South Carolina living in the same apartment as Gandolfo.
6. Using the pictures taken during the robbery, the jury could possibly conclude that there is similarity of certain general *959 physical characteristics of the robbers with those of defendants. Because of the masks, however, no other identification was possible.
7. Before the robbery, Ritter was receiving unemployment compensation. A week after the robbery he paid $1250 in cash to bail Gandolfo’s girlfriend out of jail.
Wholly lacking, of course, is the evidence, which is so reassuring to finders of fact and appellate courts, such as fingerprints, a positive identification, possession of the bank’s bait money or a confession or admission. Neither is there circumstantial evidence of the type and quality necessary to sustain a conviction. Viewing the government’s case in its most favorable light, no witness or combination of witnesses either places Ritter in the savings and loan or otherwise establishes his guilt of the robbery for which he was convicted. Although his conduct and his association with Gandolfo is highly suspect vis-a-vis the bank robbery, the links are too tenuous and the gaps are too large to conclude that a reasonable mind could find Ritter guilty beyond a reasonable doubt.
Ritter’s motion for judgment of acquittal should have been granted. It is not necessary that we consider his other contentions. His judgment of conviction is therefore reversed with directions to dismiss the indictment as to him.
GANDOLFO’S CLAIMS OF ERROR
Like Ritter, Gandolfo challenges the sufficiency of the evidence, but unlike Ritter he was provided the missing links to establish the government’s case. Gandolfo argues on appeal that although the evidence may establish that he committed a bank robbery, it does not establish that he committed this particular robbery. As deficient as such a contention is in persuasive effect, it might have merit as a matter of law except for its lack of support in the record. Both before and after the robbery Gandolfo’s statements and actions provide an evidentiary framework from which the conclusion of his guilt is not only reasonable, it is virtually inescapable.
Gandolfo complains that the court below erred in admitting his sawed-off shotgun into evidence. Neither the photographs of the robbery nor the description given by Mr. Starr were sufficient to positively identify the sawed-off, side-by-side shotgun received into evidence as the sawed-off, side-by-side shotgun used in the robbery. Gandolfo was shown to have had such a shotgun before the robbery. The shotgun in evidence was shown to have been bought by his girlfriend before the robbery and was in his possession shortly after the robbery. Gandolfo acknowledges that in United States v. Ramey, 414 F.2d 792 (5th Cir. 1969), this court adopted the rule announced in Banning v. United States, 130 F.2d 330, 335 (6th Cir. 1942), cert. denied, 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556 (1943) as follows:
Weapons, instruments and articles found in the possession of the accused at the time of his arrest, although not identified as those actually used, but similar thereto, or which from the circumstance of the finding, justify an inference of the likelihood of their having been used, are admissible to show that the accused had them for the purpose of overcoming his victim or to show a design or plan, the carrying out of which required their use.
In undertaking to distinguish Ramey, Gan-dolfo urges that sufficient similarity between the exhibit and the weapon used in the robbery was not shown. Ramey does not require that a witness testify “this exhibit is similar to the robber’s gun” if such similarity is otherwise established, as it was here by description and pictures. Gandolfo misplaces reliance on Walker v. United States, 490 F.2d 683 (8th Cir. 1974), where the weapons were shown not to be similar. Neither are we convinced by the Second Circuit’s recent decision in United States v. Robinson, 544 F.2d 611 (2d Cir. 1976), which turned on the court’s conclusion that the prejudicial effect of such evidence outweighed its probative value under clearly distinguishable facts. We conclude that there was no error in admitting Gandolfo’s sawed-off shotgun into evidence.
*960 Gandolfo’s motion for severance was unsupported by any factual showing whatever. The motion fell far short of meeting the standards set forth in Byrd v. Wainwright, 428 F.2d 1017 (5th Cir. 1970) and United States v. Diez, 515 F.2d 892 (5th Cir. 1975), cert. denied, 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1975), on which the movant relied.
His motion was simply a general statement of conclusions by counsel. With respect to the possibility of Ritter’s testifying for Gandolfo in a separate trial, there was nothing more than “a gleam of possibility in the defendant’s eye.” United States v. Wilson, 500 F.2d 715, 721 (5th Cir. 1974).
Finding no merit in Gandolfo’s contentions, we affirm his conviction.
AFFIRMED IN PART, REVERSED WITH DIRECTIONS IN PART.

. The actual testimony by Mr. Branch was that Gandolfo was to be picked up in “Bonita Beach”; however, considering the statement in context, we are confident that either this is a mistake in transcription or a minor, uncorrected error in his testimony.