**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joel William WESEVICH,**
**Defendant-Appellant.**

**No. 80–2197.**

United States Court of Appeals,
Fifth Circuit.

Feb. 4, 1982.
Rehearing Denied March 18, 1982.

---

Charles Louis Roberts, El Paso, Tex., for defendant-appellant.

Sidney Powell, Asst. U. S. Atty., San Antonio, Tex., William C. Bryson, Mervyn Hamburg, Attys., Washington, D. C., for plaintiff-appellée.

Before GARZA and RANDALL, Circuit Judges *.

GARZA, Circuit Judge:

This case presents another instance of a confidential informant telling government agents of an individual's unlawful conduct, setting up the case against him, and then serving as the key prosecution witness at trial. Confidential informants are important actors in efforts to combat crime. Certainly, much criminal activity would go unpunished but for the cooperation of these persons. However, we cannot lose sight of the fact that these confidential informants are generally involved in illegal activities themselves and hence are not model citizens whose trustworthiness is above reproach. It is especially important that the testimony of such informants be carefully scrutinized; full cross examination is essential. Our criminal justice system is grounded on the

* Due to his death on December 22, 1981, Judge Ainsworth did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. 46(d).

tenet that an individual is presumed innocent until proven guilty. When a judge places limitations on a defendant's ability to impeach a witness or question his allegedly pure motives, his actions fly in the face of this cornerstone of the judicial system. Regrettably, the district judge made a number of rulings in the trial of this case that had exactly this result. We reverse defendant's conviction because of the cumulative effect of the errors committed by the court below.

On May 14, 1980, Wayne Czapla, the confidential informant in this action, called the Drug Enforcement Administration (DEA) office to provide information about Joel William Wesevich, the defendant in this case. Later that day, two DEA agents, Bain and Sanchez, met with Czapla at the DEA Task Force Office in El Paso, Texas. First, they documented Czapla as a confidential informant. They then formulated plans to make a controlled purchase of LSD from defendant's apartment. Czapla was searched and given thirty-five dollars in prerecorded government funds with which to make the purchase. The agents drove Czapla to a location in the vicinity of defendant's apartment. They maintained surveillance of the apartment with four other agents while Czapla went in and allegedly made the purchase. Czapla exited the apartment approximately eleven minutes later and proceeded to the designated meeting place where agents picked him up. As soon as he got into the agents' automobile, he handed Sanchez a tinfoil packet which contained ten units of LSD. Czapla was later searched; the thirty-five dollars were not found on his person. An identical drug transaction occurred two days later. Again, Czapla was provided with thirty-five dollars in prerecorded government funds. He entered defendant's apartment and exited a short time later with a packet of ten LSD units. It is worthy of note that no strip search of Czapla was performed either prior or subsequent to the controlled substance transactions in which he participated.

On May 17, law enforcement authorities returned to Wesevich's apartment and, armed with a search warrant, conducted a thorough search of the premises. Their search revealed a bottle of LSD tablets. Wesevich was placed under arrest at this time and apprised of his constitutional rights. Defendant was charged in a three count indictment with possession of LSD with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). After a trial by jury, he was acquitted on the first two counts and convicted on the third count of the lesser included offense of simple possession of LSD. He was subsequently sentenced to a six-month jail term. Defendant, by means of this appeal, challenges the following trial court errors which he contends prohibited him from receiving a fair trial: (1) introduction into evidence of an extraneous offense; (2) government reliance on perjured testimony; (3) exclusion of exculpatory and impeachment evidence; and (4) failure of the trial court to require the government to rebut defendant's prima facie case of statutory and constitutional deficiencies in the grand and petit jury selection process. Finding that the actions of the court below did indeed prevent Wesevich from effectively presenting a defense, we reverse his conviction.

Wesevich first urges us to find error in the district court's approval of the introduction of an extraneous offense allegedly committed by defendant. The confidential informant was permitted to testify about the offense which supposedly motivated him to contact DEA agents about defendant. He testified on redirect as follows:

This young lady that I used to go out with a couple years ago, younger sister, she's only in the eighth grade, got ahold of one of the hits of green microdot or LSD, whatever you want to say, that Mr. Wesevich was selling, and I don't know, it must have been stronger or she couldn't adapt to it or something, but anyways, she fried—I don't—it just kind of seized her and she walked around like a board, her arms were real stiff and everything. She got put into a mental institution because of it.

She was a straight A student in school and everything, and I was very close to

this young lady. Her daughter—I mean her sister has my little boy and our families are very close. And when I found out this happened, it was the final thing that clinched it, and that's why I went to the DEA because of what he did to her with his acid.

Record, vol. 3, at 109.

Wesevich's attorney objected to the introduction of this extraneous offense as highly prejudicial and hearsay.[1] The matter had previously come up in the direct examination of this witness. At that point, defense counsel objected and a bench conference ensued. The trial judge held that mention of the matter was premature at that point. However, on redirect the judge permitted introduction of this offense on the ground that counsel had opened the door for its introduction by his aggressive cross-examination which challenged Czapla's credibility.[2] When defense counsel was permitted to inquire about Czapla's knowledge of the offense, the confidential informant admitted that he had not seen the young woman take the LSD and had not seen the defendant give it to her.[3] He asserted that de-

---

1. Defendant Wesevich also cites as error the fact that the truth of the extraneous offense was never proven. In fact, the falsity of the statement was confirmed by the testimony of a number of defense witnesses. This Circuit, since *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), has held that extrinsic offenses may be introduced only if "an offense was in fact committed and the defendant in fact committed it." *Id.* at 912. *See United States v. Brown*, 608 F.2d 551, 554–55 (5th Cir. 1979); *United States v. Krezdorn*, 639 F.2d 1327, 1333 (5th Cir. 1981).

    In his testimony about the alleged offense, Czapla declared that his former girlfriend's name was Diane Dickinson and her sister's name was Sandra. An assistant principal of the high school which Diane attended in El Paso contradicted this testimony when he stated that Diane had listed no sister named Sandra in her school records. The names of the two other siblings she listed corresponded to the other names given by Czapla. Another discrepancy between the Czapla and defense versions of this offense was provided by the assistant principal. Czapla asserted that the offense occurred either May 11 or 12, 1980. However, school records indicate that the Dickinson family moved to Illinois in 1977; their school records were transferred at that time. Czapla testified that the family moved in June of 1980.

    Defendant's father testified that he moved his family from Atlanta, Georgia to El Paso, Texas in late 1977 and that defendant did not join the family in El Paso until 1979. The testimony of both the assistant principal and defendant's father indicates that defendant did not even reside in El Paso at any time when the alleged victim lived there. Furthermore, school records suggest that the alleged victim did not exist except in Czapla's imagination.

2. The trial judge made the following comments about his admission of the extraneous offense evidence:

    But, for the record, I thought the door was rather clearly opened on cross examination for the answer, for one thing. I think the Government probably was entitled to go into it on direct, and certainly entitled to go into it on redirect because of the door being opened, like what the amount of the rental was, the constant attack on the credibility as if he went there for money because he didn't have steady employment, had cheap rent. There were a couple of other things which I just don't recall right now. But add them up and it's clearly admissible.

    Record, vol. 3, at 112.

    The judge denied a subsequent defense motion for mistrial in the following statement:

    One, you knew it was coming and you opened the door. Two, I think the Government had the right to bring it out on direct examination, anyway. And, three, his explanation was exceptionally cogent.

    Denied.

    Record, vol. 3, at 133.

3. Czapla testified in response to defense questions about the offense as follows:

    Q  You say that you found out on May the 12th of 1980—11th or 12th of May, 1980?
    A  No, sir. That's when it happened on one of those two days. I found out the morning that I called Mr. Sanchez and Bain.
    Q  I see.
    A  And that's what I said.
    Q  And what you're saying is that this young girl took this LSD?
    A  I guess so.
    Q  Did you see her do that?
    A  No, sir.
    Q  Did you see Mr. Wesevich give her this LSD?
    A  No, sir. But he was the only one who had green microdot.
    Q  In other words, this is an assumption on your part?
    A  No, sir, it's not an assumption on my part. Nobody else had green microdot LSD.
    Q  In the whole entire city, nobody had green microdot except Mr. Wesevich?

fendant was the only individual in the city of El Paso who possessed green microdot LSD and for this reason he knew Wesevich was responsible for the incident.

It is important to note that Czapla admitted on direct examination that he had been a drug dealer. The possibility that his cooperation was motivated by self-interest was impliedly before the jury at that time.[4] Defense counsel's inquiries about the details of his involvement with drugs and his employment could not possibly open further a door which the government first opened.

The admissibility of evidence of other crimes is governed by Federal Rule of Evidence 404(b), which provides:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ The manner in which the rule is phrased evidences an intent that extraneous offenses be admitted for purposes other than those expressly listed. Congress adopted an "inclusionary approach" when it authored this rule.[5] The wording of the rule also demonstrates that "other crimes"

evidence is admissible in situations where the mental state or action of the *defendant* is relevant. In the instant case, the evidence was admitted to show the motive of the witness for contacting DEA agents. Even under an inclusionary approach, this purpose is inconsistent with the intended scope of the rule and therefore is impermissible. A review of the case law in this Circuit does not reveal a case where such evidence was admitted solely to demonstrate the reason that a witness acted. At trial, the government stressed that the evidence should be admissible as demonstrative of the witness' state of mind. This argument is rejected. This case is analogous to *United States v. Benton*, 637 F.2d 1052 (5th Cir. 1981), where the Court pointed out that the government went beyond demonstrating merely a state of mind when it introduced an indictment charging defendant with murder and read into evidence a sentencing transcript in which the judge discussed the investigation of defendant for two homicides. The Court stated: "We do not believe that the government's distinction can remove this evidence from the balancing process required by *Beechum* and Rule 403." *Id.* at 1056 n.1. Likewise in this case, the government's repeated mention of this highly prejudicial incident renders the attempted distinction in the instant case equally unconvincing.

---

    A  Only one person, the person that supplied him.

Record, vol. 3, at 121.

4. Czapla engaged in the following colloquy with the government attorney on direct examination:

    Q  Did you deal in any drugs during that period of time, from July of 1979 to May of 1980?

    A  Yes, sir, we did.

    Q  And could you tell the jury how that worked? Well, don't tell us what it was that you dealt in. Why don't you tell us who worked for whom?

    A  Well, he would buy it and I would sell it.

Record, vol. 3, at 29.

5. The Advisory Committee on Proposed Rules made the following notes about Rule 404(b):

Subdivision (b) deals with a specialized but important application of the general rule excluding circumstantial use of character evidence. Consistently with that rule, evidence of other crimes, wrongs, or acts is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it. However, the evidence may be offered for another purpose, such as proof of motive, opportunity, and so on, which does not fall within the prohibition. In this situation the rule does not require that the evidence be excluded. No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403. Slough and Knightly, Other Vices, Other Crimes, 41 Iowa L.Rev. 325 (1956).

For an enlightening discussion of the imposition of stringent limits on the admission of other crimes evidence and court rationale therefor, see Comment, 55 Notre Dame Law. 574 (1980).

The government also characterizes as harmless any error in admission of the extraneous offense since defendant was acquitted on both counts where the testimony of Czapla was relevant. We are unconvinced by this argument. Czapla presented a fabricated story of his pure motives for informing the government about defendant. It is the combination of the introduction of the extraneous offense with the court imposed limitation on testing Czapla's credibility that constitutes reversible error. These errors operate in concert to throw all suspicion off Czapla and place it squarely on Wesevich's shoulders. Thereby, they foreclose the development of Wesevich's defense.

The importance of the tool of cross-examination in our judicial system cannot be overstated. As the Supreme Court declared in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974):

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.... A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore Evidence § 940, p. 775 (Chadbourn rev 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

*Id.* at 316, 94 S.Ct. at 1110.

At the trial of this case, the court prevented defense counsel from questioning Czapla about the reason he kept his drugs away from his place of residence. This cross-examination was crucial to the defense theory that the confidential informant secreted drugs in defendant's apartment because his sister forbade him to keep them at her trailer. Czapla admitted on direct examination that he had been a drug dealer. This admission opened the door for an inquiry into his reason for coming forward with information about Wesevich.[6] The Court also prohibited defense counsel from obtaining details about Czapla's drug deals.[7] This testimony was also crucial to the defense of this case since counsel was prepared to present the testimony of an individual to whom Czapla sold drugs. Later, when the defense counsel called this witness to the stand, the judge ruled that it was precisely this lack of foundation that

---

6. The theory that Czapla was a major drug dealer who secreted his drugs in defendant's apartment would also be exculpatory to Wesevich and would also impeach Czapla's statement about his real motive for testifying in the case. Conviction of the violation with which Wesevich was charged requires that both possession and knowledge be demonstrated. The conviction is therefore inconsistent with the defense theory of the case, the development of which was incorrectly prohibited.

7. At the time that defense counsel attempted to inquire about the details of Czapla's last drug sale, attorney for the government objected. The following statement was made by defense counsel at the bench conference:

> Your Honor, if it please the Court.

I think that it is very relevant for me to determine inasmuch as he has indicated that he has sold drugs on May the 11th of 1980 and he has now stated that he has sold these drugs that belong to Joel Wesevich.

I am anxious to know who it was that he sold it to for purposes of having that person come give testimony here if that was indeed the case.

He has indicated that on May the 11th, he got some drugs from my client and sold them to somebody else and *I think it is very relevant for me to know who it was that he sold it to because I don't think that is the case and I think it is very important for me to show that jury that that is not the case.*

Record, vol. 3, at 69–70 (emphasis added).

990

prevented him from allowing defense to question the witness about her knowledge of Czapla's drug dealings. The judge effectively placed the defendant in a 'Catch-22' situation by his rulings.

This Court has recognized on a number of occasions that when a "star" government witness is involved, the importance of cross-examination is amplified. *United States v. Rice*, 550 F.2d 1364, 1371 (5th Cir. 1977); *Beaudine v. United States*, 368 F.2d 417, 424 (5th Cir. 1966). The question of the credibility of this star witness was raised on direct examination when he admitted participation in illegal activities. The prohibition on cross-examination imposed here prevented defendant from developing his defense. He was not able to reveal to the jury the fact that Czapla was not a credible witness. There is no way to evaluate the harm of the limitations imposed. We cannot allow a conviction to stand where we are left in doubt about so important an issue as Czapla's trustworthiness and credibility. *Beaudine, supra,* at 424.

■ We next turn to defendant's contention that the government deprived him of a fair trial by relying on the perjured testimony of Czapla. We reject this claim. There was no demonstration that the prosecution knowingly relied on false testimony here. *See United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978).

Finally, we consider defendant's challenge to the grand and petit jury systems in El Paso, Texas. Prior to the trial of this case, Wesevich filed a motion to dismiss his indictment. The basis for this motion was the allegation that Hispanics had been systematically excluded from both grand and petit juries in the Western District of Texas. He produced statistics to demonstrate that 58.1% of the gross population of the district was Hispanic but only 38.5% of the

registered voters had Spanish surnames. The Master Jury List in El Paso is drawn exclusively from the voter registration lists. His expert witnesses attributed this 19.6% disparity to the fact that persons of Mexican-American descent register to vote in lesser numbers than persons of other ethnic groups. Defendant contends that this disparity presents a prima facie case that the jury selection process does not provide a representational cross-section of the community, as required both by the constitution and statute.

■ First, we consider defendant's claim that the underrepresentation violates constitutional due process. A prima facie case of discrimination in the jury selection process is established by demonstration that: (1) the group discriminated against is a 'distinctive' group in the community; (2) this group has been substantially underrepresented on juries for a significant period of time; and (3) the selection procedure is not racially neutral or is susceptible of being used as a tool of discrimination. *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). In addition, *Castaneda* directs the defendant to demonstrate intentional discrimination. Wesevich fails to establish either the required prima facie case or intentional discrimination. Defendant bases his claim solely on statistical evidence, a practice condemned by this Court in *United States v. Arlt*, 567 F.2d 1295 (5th Cir. 1978). In that case, the Court also stated that "[t]he use of voter registration lists has been upheld by this Court even if an identifiable group votes in a proportion lower than the rest of the populace." *Id.* at 1297.

Defendant also argues that the El Paso grand and petit jury selection process violates the Jury Selection and Service Act of 1968.[8] 28 U.S.C. §§ 1861 et seq. This stat-

8. 28 U.S.C. § 1861. Declaration of policy
It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all

citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.
28 U.S.C. § 1862. Discrimination prohibited
No citizen shall be excluded from service as a grand or petit juror in the district courts

ute approves the adoption of a jury plan based on the selection of jurors exclusively from voter registration lists. Supplementation of these lists is required, however, "*where necessary* to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." 28 U.S.C. § 1863(b)(2) (emphasis added). Defendant alleges that the plan utilized in the Western District of Texas violates the Act since it does not mandate supplementation of the voter registration lists with lists from other sources. We reject this contention. Defendant fails to carry the burden of establishing a prima facie case of violation of the Jury Selection and Service Act.

The raw statistical evidence presented by defendant provides no basis for the conclusion that supplementation of the lists is necessary. The city of El Paso is, after all, situated at the border of the United States with Mexico. In response to the defendant's demonstration of a 19.6% of disparity, the government replies that many Hispanic residents of El Paso are not Hispanic *Americans*. They are therefore ineligible to vote. Defendant also fails to account for Hispanics without Spanish surnames, the government notes. Nowhere does defendant demonstrate a disparity between the percentage of Hispanic Americans in El Paso and the representation of this group as registered voters. Clearly, it is this disparity with which the Act is concerned and failure to address this issue is fatal to his claim.[9]

Although we affirm the denial of Wesevich's motion to dismiss the indictment, we must reverse the conviction because of the cumulative effect of trial court errors relating to the admissibility of evidence.

REVERSED AND REMANDED.

---

of the United States or in the Court of International Trade on account of race, color, religion, sex, national origin, or economic status.

**9.** We note that the El Paso grand jury selection process was very recently considered and approved by this court in *United States v. Brummitt,* 665 F.2d 521 (5th Cir. 1981).