**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles EMERY, Jr.,
Defendant-Appellant.**

**No. 81–1174.**

United States Court of Appeals,
Fifth Circuit.

July 30, 1982.

Rehearing Denied Aug. 25, 1982.

Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for defendant-appellant.

LeRoy M. Jahn, Asst. U. S. Atty., San Antonio, Tex., Francis J. Martin, Atty., Dept. of Justice, Washington, D. C., for the U. S.

Before THORNBERRY, REAVLEY and RANDALL, Circuit Judges.

THORNBERRY, Circuit Judge:

Charles Emery appeals from his conviction on one count of armed robbery under 18 U.S.C. § 2113(a). No one disputes proof that Emery entered the South Park National Bank in San Antonio, Texas, on September 25, 1981, with the intent of robbing it, nor do the parties disagree on Emery's ability to conduct himself with the appearance of rationality. The single issue in the court below was whether Emery had the capacity to conform his conduct to the requirements of the law when he robbed South Park National Bank. Emery contends that as a paranoiac operating within an intricate delusional system, he was legally insane at the time of the robbery. The government counters this claim by portraying Emery's conduct as consistently organized, calculated, and rational. To this end, the prosecution offered evidence to prove that appellant had robbed an Atlanta bank one month before the San Antonio robbery in exactly the same manner. The propriety of admitting this evidence of another crime under Fed.R.Evid. 404(b) is the primary issue presented for review in this court. Appellant also alleges error in the prosecutor's comment on the evidence during the cross-examination of an expert, and in the admission of a statement by appellant after the robbery showing that he understood his *Miranda* rights.

I. FACTS

Appellant has shown an interest in the occult and psychic phenomenon since his sophomore year in high school. Though he has believed for years that he possessed strong psychic powers, his paranoiac delu-

sions did not begin until he received a mediocre performance evaluation from his superior officer in the Navy sometime between 1974 and 1978. Appellant's feeling that his rating was unfair gradually transformed into an obsessive fear that the report would fall into the hands of national intelligence agencies, such as the CIA, who would then try to control his mental processes. Appellant sought help from various psychic consultants in New York and in Atlanta, where he later resided. His sessions with a psychic in Atlanta in 1979 were recorded on tape and admitted into evidence at trial.

The psychic corroborated appellant's belief in his own telepathy powers and his fear that intelligence agencies were trying to control him. She warned him to escape the affections of a co-worker at the hospital where he was employed because the co-worker was a tool of intelligence agencies. Emery, therefore, quit his job to tour psychic research institutes in Europe. He journeyed through London, Finland, and Moscow, spending the last of his inheritance. Upon his return to the United States, Emery's fear of intelligence agencies intensified. A psychic told him that intelligence agencies were using other psychics to read his mind and monitor his thoughts. She advised Emery to escape their pending grip on his mind by remaining mobile. He succumbed to his fears and began a lonely journey through America and Canada staying no longer than four or five hours in any one place. He eventually ran out of money and returned to Atlanta.

On August 25, 1980, he entered the Standard Federal Savings & Loan Association in Atlanta and demanded $10,000. An accounts assistant from Standard Federal described in detail appellant's behavior during the robbery. An FBI agent assigned to investigate the robbery corroborated her testimony. According to the testimony of these lay witnesses, Emery spoke calmly and appeared normal in both gestures and movements. He indicated that he had a weapon, though he never displayed one. He placed the money in an old green army bag and escaped.

Appellant left Atlanta after the bank robbery and headed for the Baja peninsula where the psychic had predicted he would join Jacques Cousteau in creating an undersea farming community. He decided to pass through San Antonio on his way. When he arrived in this river city, he had only five or ten dollars in his pockets. Reflecting on his predicament in the parking lot of a local shopping center on the morning of September 25, 1980, appellant's thoughts turned to a solution that had proven successful one month earlier: bank robbery. He claimed at trial that his fear of intelligence agencies prevented any consideration of alternative means of obtaining money.

Appellant checked out at least one other bank before arriving at his target, South Park National Bank. Wearing a cap and sunglasses, appellant again approached a teller with his hand inside the green army bag to give the appearance of a handgun, and again, he stated, "this is a stick-up." After hitting the alarm near her desk, the teller gave appellant over $8,000. Pursued by two male bank employees, appellant ran out the door. The employees caught appellant as he was trying to back his 1978 Mazda out of its parking place. The car's repeated stalling prevented a fast getaway. One of the employees opened the door on appellant's side of the car, pressed his foot on the brake, and turned the key off in the ignition. He found the green bag filled with the stolen money on the passenger's side of the front seat. The police arrived shortly thereafter and arrested appellant. Appellant's response to police officers suggested that he was sufficiently coherent to understand his *Miranda* rights. Appellant subsequently was indicted first for the San Antonio robbery and then for the Atlanta robbery. Nothing in appellant's conduct during the commission of these crimes suggested any form of mental illness to eyewitness observers.

## II. ADMISSIBILITY OF THE ATLANTA ROBBERY

▮▮▮▮ Rule 404(b) provides that "Evidence of other crimes, wrongs, or acts is not

admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), this court construed the rule in light of the other rules of evidence and held that Rule 404(b) calls for a two-step test: "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403."[1] The resolution of these questions lies within the sound discretion of the trial judge, and the decision to admit extrinsic evidence will not be disturbed absent a clear showing of an abuse of discretion. *United States v. Vincent*, 648 F.2d 1046, 1051 (5th Cir. 1981); *United States v. De La Torre*, 639 F.2d 245, 250 (5th Cir. 1981); *United States v. Benton*, 637 F.2d 1052, 1056 (5th Cir. 1981). This Court is unusually mindful of this standard of review in a case like the instant one where the question of admissibility is difficult and where the trial judge carefully weighed the appropriate criterion in light of the proof presented.

■ Before we discuss the probative value of the extrinsic offense, we discuss briefly what the government must prove to obtain a conviction. A person violates 18 U.S.C. § 2113(a) when he takes money from a bank through force or intimidation. Bank robbery under this section is a general intent and not a specific intent crime. *United States v. Smith*, 638 F.2d 131, 132 (9th Cir. 1981). Appellant has never urged that he lacked the capacity to distinguish right from wrong for purposes of criminal liability. Rather, he insists that he lacked the requisite intent because his paranoiac

delusions rendered him unable to conform his conduct to the law. His capacity to conform his conduct to law thus constituted the focal point of dispute at trial. Now this Court must consider whether evidence of appellant's conduct during the Atlanta robbery is relevant to that issue.

■ An offer of proof is relevant when it has any tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The District Judge concluded that the extrinsic offense was relevant after listening to the testimony of a psychiatrist who stated that evidence of the Atlanta robbery was a significant factor in his analysis of whether appellant was legally insane. The judge's finding of relevancy is consistent with one of the few decisions in this circuit which address the relevancy of an extrinsic offense to an insanity defense. In *United States v. Davis*, 513 F.2d 319, 321 (5th Cir. 1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1129, 47 L.Ed.2d 329 (1976), the appellant raised an insanity defense to a charge of kidnapping. The government presented evidence of (1) another crime in which the appellant used the same alias; (2) a car theft occurring the same day of the kidnapping; and (3) the rape of the kidnapped victim. Finding that the evidence was properly submitted to the jury, this Court accepted the government's contention that:

[A]ppellant's conduct on all these occasions evidenced a well organized goal directed individual; that his acts, including his attempt to conceal his identity, to cover the course of his conduct, and to facilitate his escape, indicated no lack of coordination or reasoning, nor acts of a person acting out of impulse, but clearly indicated that he was acting according to design and plan, wholly consistent with the acts of a sane person and equally

---

1. Rule 403 provides:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

inconsistent with one afflicted with a mental disease.

513 F.2d at 321.[2]

Appellant argues that even if the extrinsic offense is relevant, it is relevant only to his defense of paranoia because it tends to establish compulsion. He, therefore, insists that the evidence cannot be admitted on behalf of the government. The government, on the other hand, contends that appellant's behavior during the Atlanta robbery reveals a rational mind capable of adapting to the demands of the law. Since the extrinsic offense is identical and close in time to the San Antonio robbery, it is highly likely, according to the government, that appellant "indulged himself in the same state of mind in the perpetration of both the extrinsic and charged offenses." *United States v. Renteria*, 625 F.2d 1279, 1281 (5th Cir. 1980); *Beechum, supra*, 582 F.2d at 911.

■ Admittedly, the extrinsic offense evidence in this case lends itself to conflicting interpretations, primarily because a defendant's mental state is frequently not revealed through physical conduct. Nevertheless, we cannot say that the district court abused his discretion in deeming the evidence admissible. First, we have encouraged trial judges to be liberal in their evidentiary rulings affecting proof of sanity. "This is in keeping with the philosophy of letting in all facts which might be helpful to the jury in making the final determination of the criminal responsibility of the accused." *United States v. McRary*, 616 F.2d 181, 184 (5th Cir. 1980). *See also United States v. Ives*, 609 F.2d 930, 932 (9th Cir. 1979), *cert. denied*, 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 605 (1980). Second, once the trial court has determined that an offer of proof makes the existence of a fact more

likely or less likely, it is for the jury to weigh that evidence and to draw reasonable inferences therefrom. *See United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc).

■ The district court determined that the extrinsic offense evidence was relevant on the basis of a psychiatrist's opinion that it was a factor leading to his diagnosis and, after listening to lay witnesses describe appellant's behavior during the Atlanta robbery, on the basis of the government's contention that the robbery revealed appellant's capacity to conform his conduct to law. Although the psychiatrist for the defense testified that the prior bank robbery tended to prove compulsion, the jury was not bound to accept his conclusion.[3] They were free to regard the extrinsic offense in the light urged by the government if that interpretation could be characterized as a reasonable one. We think that it can.

■ Psychiatrists for the government described appellant as having the ability to make a choice between bank robbery and some other means of obtaining money. They reached this result in part because no aspect of bank robbery was part of appellant's delusion. The argument that he was compelled to rob banks appears weaker when one considers that he had resisted the alleged impulse prior to August 1980. Appellant travelled for many months apparently without experiencing an overwhelming compulsion to rob banks. In the context of this history, the Atlanta robbery may represent simply a voluntary decision to disobey the law though he has the capacity to conform. Thus, it indicates that when appellant robbed the Atlanta bank, he nevertheless continued to possess the ability

---

**2.** *See also Davis v. United States*, 413 F.2d 1226, 1230 (5th Cir. 1969), where the court stated: "Evidence of an accused's conduct may under proper circumstances be introduced to support a *lay witness'* testimony that the accused appeared sane during a period reasonably proximate to the commission of the offense."

**3.** The testimony given by psychiatrists, even when uncontradicted, is not conclusive on the issue of sanity. The jury can find expert testimony adequately rebutted by the observations of laymen. *United States v. Mota*, 598 F.2d 995, 999 (5th Cir. 1979), *cert. denied sub nom*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980); *United States v. Hall*, 583 F.2d 1288, 1293 (5th Cir. 1978); *Brock v. United States*, 387 F.2d 254, 257 (5th Cir. 1967).

to resist a criminal impulse. When he robbed South Park National in San Antonio one month later, he may have been simply repeating conduct that had been proven successful, rather than acting out of compulsion. Furthermore, appellant's conduct during the robbery supports the inference that he was able to conform to the requirements of the law insofar as it shows the capacity to formulate a plan and to follow it through rationally and with self-control.[4] When appellant arrived in San Antonio and decided to rob another bank, he checked out at least one other target before choosing South Park National. This again suggests an ability to resist the power of his delusions.

■ We do not find the extrinsic offense to be persuasive evidence of legal sanity standing alone. It must be considered in the context of appellant's history with the recognition that sanity is a unique issue requiring proof of many facts that by themselves may lack significance. Because a well considered judgment on the criminal responsibility of the accused requires a wide knowledge of the facts relating to his behavior, *McRary, supra*, 616 F.2d at 184, and because the jury, considering the extrinsic offense in light of all the evidence presented, reasonably could have viewed the Atlanta robbery as suggesting an ability to conform to the law, we cannot say that the trial judge clearly abused his discretion in finding the evidence relevant. *De La Torre, supra*, 639 F.2d at 250.

■ Appellant also contends that even if the evidence is relevant, the government did not "need" to introduce it to prove its case. *Beechum* requires that the admission of the extrinsic offense evidence constitute more than a " 'needless presentation of cumulative evidence.' " 582 F.2d at 917.

While this Court has not defined the degree of "need" that the government must show to render the evidence admissible, *see Benton, supra*, 637 F.2d at 1057, and *United States v. McMahon*, 592 F.2d 871, 875 (5th Cir. 1979), it seems clear that the government's case need not be "flimsy" to justify admission of the extrinsic offense evidence. *United States v. Barnes*, 586 F.2d 1052, 1059 n.8 (5th Cir. 1978). Even if the government's proof of intent is "adequate," we may find its need sufficient to warrant admission of the testimony. *McMahon, supra*, 592 F.2d at 875.

■ In considering the government's need for the extrinsic offense evidence, we first acknowledge the heavy burden placed on the government once a defendant introduces slight evidence of lack of capacity: The government must prove beyond a reasonable doubt that the accused had the capacity to conform his conduct to the law. *United States v. Mota*, 598 F.2d 995, 999 (5th Cir. 1979), *cert. denied sub nom.*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980); *United States v. Phillips*, 519 F.2d 48, 49 (5th Cir. 1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976). This task is difficult not only because the government has a weighty burden of proof, but also because the object of proof—sanity—can never be established directly.

■ Since the extrinsic offense evidence in this case, as we have explained, has its real significance within the context of appellant's behavior during the year prior to the robbery, we view the government's need for the evidence in light of its need to rely generally on the observations of lay witnesses. Lay testimony was perhaps unusually important to the government's case because the experts were not sharply conflicting. Experts for both sides conceded

---

4. That the extrinsic offense is in any way consistent with paranoia does not render it irrelevant to the government's position. Paranoia and capacity to conform to the requirements of the law are not two sides of the same coin in every case. In fact, the sanity issue in this case ultimately *is* reduced *to* whether appellant's paranoia rendered him unable to conform his conduct to the law. Paranoia and legal sanity

are two distinct issues, and while self-control and premeditated action may be consistent in some instances with paranoiac personalities, they are equally, if not more, consistent with the mental capacity to conform one's conduct to the law. Whether the extrinsic offense in this case tends to prove lack of capacity or sanity is a choice between reasonable inferences that the jury should make.

appellant's paranoia. One psychiatrist for the government, Dr. John C. Sparks, diagnosed appellant's mental disorder as paranoiac. The government's other psychiatrist stated that paranoia was "possible." The clinical psychologist for the government admitted that he could not rule out paranoia as the correct diagnosis. As the last witness to testify before closing arguments, Dr. Sparks also stated that the ultimate question of legal sanity in this case was not answered easily, and for this reason, other experts could dispute his conclusion that appellant could conform his conduct to the law. He even conceded that it was "possible" for appellant to be unable to conform his conduct to law on the day of the robbery. Insofar as evidence of the Atlanta robbery portrays appellant as a person who can conform his conduct to the law's requirements, it tends, however slightly, to help the trier of fact choose among expert explanations of appellant's conduct or reject expert opinion entirely. Bearing in mind again the narrow scope of review available to us on this issue, we find that the government's need for the extrinsic offense was sufficient to justify admission of the evidence.

 In reaching this conclusion, we emphasize that relevance and need cannot be considered in a vacuum. The application of *Beechum* to the facts of any case requires a commonsense assessment of all the circumstances surrounding the extrinsic offense. Rule 404(b) offers no mechanical solution: "The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors appropriate for making decisions of this kind under Rule 403." Advisory Committee Notes on Proposed Rules of Evidence, 28 U.S.C. Rules of Evidence at 109 (1975). *See also United States v. Wesevich*, 666 F.2d 984, 988 n.5 (5th Cir. 1982). This brings us to the second step in the two-part test established in *Beechum*, which requires us to ask whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice. We accept the district court's conclusion on this point for several reasons.

First, though appellant did not choose to offer this evidence, he recognizes that the jury could weigh the evidence in his favor. At least one expert testified that he interpreted the prior bank robbery as additional evidence of appellant's compulsive desire to escape intelligence agencies. Appellant's attorney made this view of the extrinsic offense clear to the jury. Second, a record of over one thousand pages convinces us that the government did not use the extrinsic offense to portray appellant as "a bad man" with a propensity for robbing banks. In its closing statement, the government made a single direct reference to the Atlanta robbery. The focus of the trial from the beginning was whether appellant could conform his behavior to the standards set by law. In light of the overwhelming amount of psychiatric testimony, it is highly unlikely that the jury was misled as to the probative purpose of the extrinsic offense evidence. Finally, we note that the extrinsic offense here is not of a heinous nature: "[I]t would hardly incite the jury to irrational decision by its force on human and emotion." *Beechum, supra,* 582 F.2d at 917. Under these circumstances, the judge's cautionary instructions to the jury on the limited use of the extrinsic offense evidence were adequate to prevent any undue prejudice engendered by testimony regarding the Atlanta robbery.

The admissibility of the extrinsic offense evidence to prove appellant's legal sanity has troubled this Court just as it disturbed the district judge. Nevertheless, we are convinced that appellant has shown no clear abuse of discretion in the district court's admission of the evidence. Sanity is very hard to define and to prove, and in the past, we have encouraged district judges to be liberal in their rulings affecting proof of sanity. *McRary, supra,* 616 F.2d at 181. We believe that rational disobedience of the law in Atlanta can be construed, in the context of appellant's history prior to the robbery, as evidence of capacity to conform to the law. The district court's discretion to determine questions of relevancy is a

basic doctrine in the law of evidence. That this case presents a close relevancy question only tends to justify leaving the determination in the hands of the district judge. For all of the reasons in the foregoing analysis, we hold that evidence of the Atlanta robbery was admissible under Rule 404(b).

## III. IMPROPER PROSECUTORIAL COMMENT

Appellant contends that the prosecutor overstepped the bounds of zealous representation during the cross-examination of Dr. Habib Nathan. In response to the prosecutor's questioning, Dr. Habib asked whether the prosecutor accepted the doctors' diagnosis of paranoia. The prosecutor replied, "No, Doctor, I don't, but that's beside the point." Appellant's attorney immediately objected, and the district court instructed the jury that a lawyer cannot testify and ordered them to "disregard the comment of counsel entirely." The government concedes, and we agree, that the prosecutor's reply to the witness was inappropriate. "An attorney may not express his personal beliefs about the evidence or the witnesses." *United States v. Grapp*, 653 F.2d 189, 195 (5th Cir. 1981). *See also Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978).

Although the prosecutor's statement constitutes error, however, it is not reversible error. "Error must be regarded as harmless if, upon an examination of the entire record, substantial prejudice to the defendant does not appear." *Morris, supra*, 568 F.2d at 402. Having studied the entire record, we are convinced that appellant suffered no prejudice. The district court cautioned the jury at least twice, in reference to the prosecutor's comment, that remarks made by the lawyers were not to be considered as evidence. The prosecutor him-

self suggested that his opinion was of no significance in the case. Moreover, the expert witnesses for the government, by acknowledging appellant's paranoia, directly refuted the prosecutor's opinion. While we do not approve prosecutorial comments of this nature, we must find that it caused no substantial prejudice to the appellant.[5]

## IV. CONCLUSION

Finally, appellant claims that the district court committed reversible error under *Miranda v. State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in allowing the arresting police officer to testify that appellant told the arresting officer that he understood the *Miranda* warnings read to him. The prosecution offered this testimony as tending to show that appellant was thinking clearly immediately after the robbery, an inference that slightly undermines his defense of insanity. Appellant cites no authority, and we could discover none, to support exclusion of the testimony. While it is true that the prosecution may not use statements, whether inculpatory or exculpatory, stemming from custodial interrogation of the defendant "unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination," *id.* at 444, 86 S.Ct. at 1612, appellant's response that he understood his *Miranda* rights does not constitute a statement within this prohibition.

It borders on absurd to characterize an inquiry into whether a defendant understands his *Miranda* rights as an "interrogation" justifying exclusion. An interrogation is a query "reasonably likely to elicit an incriminating response from the subject." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted). We cannot see how the

---

5. Appellant insists that the comment constitutes reversible error for the additional reason that the case is a "close one," and therefore, the improper remark will carry more weight than it otherwise would. *See U. S. v. Rodriguez*, 5th Cir., 585 F.2d 1234 at 1244. This

argument is unpersuasive because the evidence tending to prove paranoia is not "close." All of the experts acknowledge appellant's paranoia. They disagreed on his capacity to conform his conduct to the requirements of the law.

officer in this case reasonably should have known that appellant's reply would be admitted as tending to undermine his defense of insanity. *See* 100 S.Ct. at 1690. Furthermore, a simple "yes" indicating that an individual understands his constitutional rights cannot be compared to the silence that may follow *Miranda* warnings. Silence has been construed as inherently ambiguous, and testimony proving silence on the part of the accused is generally inadmissible. *Doyle v. Ohio*, 426 U.S. 610, 616–20, 96 S.Ct. 2240, 2244–45, 49 L.Ed.2d 91 (1976); *United States v. Martinez*, 577 F.2d 960, 963 (5th Cir. 1978), *cert. denied sub nom*, 439 U.S. 914, 99 S.Ct. 288, 58 L.Ed.2d 262 (1979). By contrast, a positive response revealing comprehension is neither ambiguous nor intrinsically incriminating. In addition, we note that this case is not one where the government seeks to introduce illegally seized evidence to rebut an insanity defense. *Cf. United States v. Hinckley*, 672 F.2d 115 (1982).

Indeed, an inquiry into whether an arrested person understands his rights is fundamental to the meaningful exercise of those rights. This basic truth underlies cases addressing the issue of whether an individual has voluntarily waived his *Miranda* rights. The accused cannot waive his rights unless he first indicates his full understanding of what he is surrendering, and proof of his intelligent comprehension is clearly admissible to show voluntariness. *See Henry v. Dees*, 658 F.2d 406, 409–10 (5th Cir. 1981); *United States v. Satterfield*, 644 F.2d 1092, 1097 (5th Cir. 1981). For these reasons, we hold appellant's response admissible as tending to prove his legal sanity immediately after the robbery.

Having found no ground for reversal in appellant's arguments, we affirm the judgment of the district court.

AFFIRMED.

RANDALL, Circuit Judge, dissenting:

I respectfully dissent.

Emery admits that he robbed the San Antonio bank. The single issue in the court below was whether Emery had the capacity to conform his conduct to the requirements of the law. We are required to decide whether evidence of an extrinsic offense, a bank robbery in Atlanta, is relevant to that issue.

The majority states that psychiatrists for the government described Emery as having the ability to make a choice between bank robbery and some other means of obtaining money. In their view, robbery was not part of Emery's delusion. The significance of this testimony is that if we were assessing the sufficiency of the evidence (which we have not been asked to do), there would be sufficient evidence to sustain the conviction. The majority goes on to say that in the context of this history, the Atlanta robbery may represent simply a voluntary decision to disobey the law though Emery has the capacity to conform. I agree—it may. But then again, it may not. Where I part company with the majority is its conclusion that when Emery robbed the Atlanta bank, "he nevertheless continued to possess the ability to resist a criminal impulse." How can evidence that Emery robbed the Atlanta bank be probative of his ability, continued or otherwise, to resist a criminal impulse?

One thing is for sure. It *is* evidence that he is a bank robber. It may, therefore, have been highly prejudicial.

I would reverse and remand for a new trial.