**UNITED STATES of America**

v.

**Aubrey E. PIERSON, Appellant.**

**No. 73–1831.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 7, 1974.

Decided Aug. 28, 1974.

Patrick J. Moran, Washington, D. C. (appointed by this Court), for appellant. George P. Lamb, Jr., Washington, D. C. (appointed by this Court), was on the brief for appellant.

James M. Hanny, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., at the time the brief was filed, John A. Terry and Barry W. Levine, Asst. U. S. Attys., were on the brief for appellee.

Before WRIGHT and MacKINNON, Circuit Judges, and JAMESON,* United States Senior District Judge for the District of Montana.

JAMESON, District Judge:

Appellant, Aubrey E. Pierson, was convicted of armed robbery and carrying a dangerous weapon in violation of 22 D.C.Code §§ 2901, 3202 and 3204.[1] He contends that the district court erred in permitting a witness to give his lay opinion regarding the direction of a bullet fired into a wall at the scene of the alleged crime.

According to the Government's evidence, at approximately 3:00 A.M. on January 23, 1971, Ted J. Williams, an off-duty police officer, was working as night auditor at the Diplomat Motel in Washington, D. C. Prior to auditing the day's receipts, he left his desk in the motel lobby to get a coke from a machine in an adjoining hallway. After getting the coke, he saw a man, later identified as appellant, walking toward him with a gun in his hand. Appellant placed the gun in the small of Williams' back and directed him to the area of the cash register. Upon reaching the cash register, appellant ordered Williams to open the cash drawer. After Williams had done so, appellant placed his gun in his pocket, reached into the cash register with both hands and removed approximately $500.00.

Williams started to reach for his own gun, a .38 caliber revolver.[2] Upon seeing Williams' movement, appellant removed his gun from his pocket and said "Don't do it". Williams grabbed appellant's right hand and during the ensuing struggle one shot was fired. Appellant broke loose and fired at Williams but missed.[3] As appellant moved toward the rear door, from which he had entered, Williams fired at him and appellant grabbed the small of his back and cried, "Oh, My God." Williams fired a total of six shots,[4] and it was later found that appellant was struck in the left jaw, hand, foot, and pelvis.

Williams telephoned the police. In response to a radio call, Officer James Money arrived shortly after appellant left. He inspected the lobby area and found a trail of blood leading from the desk area through the lobby to the back door (through which appellant entered and departed), blood on a door handle, and a human tooth on the floor. He observed a bullet hole approximately 14 feet up the wall and another in a filing cabinet. He testified that in his opinion the bullet entering the wall was fired from the central portion of the motel lobby.

An officer of the Metropolitan Police Crime Laboratory removed blood scrapings from the counter inside the office door.[5] He also found blood on the outside of the door leading to the parking area, four .32 caliber shell casings and lead fragments inside the office area, and what appeared to be bullet holes in the ceiling.[6]

The lessee of a dining room and lounge in the Diplomat Motel testified that he heard what sounded like gun shots and a man shouting "Halt" coming from the lobby area.[7] Through glass doors divid-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. A prior trial resulted in a mistrial when the jury could not agree on a verdict.

2. Williams was required by the Police Department to carry his weapon at all times while off duty.

3. Williams identified appellant's gun as a .25 or .32 caliber automatic pistol and testified that appellant fired three or four shots.

4. After this type of weapon is discharged the shell casing remains in the chamber.

5. It was later stipulated that these scrapings and appellant's blood were both type O.

6. The officer took a number of photographs and made a diagram indicating the location of the blood stains, tooth, shell casings and lead fragments. The blood trail led from the office area to the outer door.

7. He testified further that "there was * * * a sharper sound and one that wasn't really as sharp. I am talking about six, seven shots". He recognized Williams' voice saying "Halt".

ing the lounge area from the lobby, he saw a man running towards the back door "reaching for himself" with his right hand.

Following an anonymous phone call and photographic identification, a warrant was obtained for appellant's arrest on January 29, 1971. The arresting officer was informed by two women that appellant did not live at the address given, but upon entering the premises, the officer found appellant hiding in a bedroom closet. He was admitted to the District of Columbia General Hospital and treated for his gunshot wounds. The chief of the Hospital's dental department examined the tooth recovered at the motel and found that it fit into the configuration of appellant's left molar root.

Appellant admitted that he was present at the Diplomat Motel, but testified that he was there to purchase narcotics from Williams. He claimed that he had met Williams at the residence of Francis Harper, since deceased, and had arranged to purchase narcotics from Williams through Harper. He was aware that Williams "was protecting people who were hustling". He knew that Williams had access to narcotics taken from various persons on the street.

Appellant testified that a meeting had been scheduled with Williams between 2:45 A.M. and 3:00 A.M. He was driven to the Diplomat Motel by Billie Robinson in Robinson's car.[8] He entered the side door of the motel lobby and noticed Williams standing by a vending machine. After identifying himself, appellant stated that it was his understanding that he would receive "sixteen spoons of heroin" from Williams. Harper had previously given Williams $1,500 of appellant's money in payment of the heroin. Appellant and Williams walked to the office area. "At this point he didn't produce what I came after and we got into a little argument." As appellant walked toward the front door, he noticed a gun in Williams' hand. Appellant lunged toward Williams but was shot in the jaw. He threw up his arm and was shot in the hand and then the foot. He then ran out of the motel, got into the car and drove home.[9]

Appellant denied having a gun in his possession or owning an automatic pistol on January 23, 1971. He denied that he had taken any money from the cash drawer. He testified that when he left the motel he had between $1,300 and $1,400 he had earned and saved. Appellant admitted on cross-examination that he had told a doctor on admission to the hospital that he "got shot in a robbery".[10]

The sole issue on this appeal is whether the district court abused its discretion in permitting Officer Money to testify regarding the direction from which the bullet hole in the wall was fired. He was asked for his lay opinion as to whether he was "able to tell the direction by which [the bullet] went into the wall". Over defendant's objection he was permitted to answer, responding: "From the angle where I saw the holes, from in this area somewhere", indicating the area of the diagram. The examination continued:

"Q What are you pointing to that area for? That is what?

"A. The hallway. This is the hallway.

"Q I ask you, In what direction was the bullet fired?

"A From this area here.

"Q That would be in the central portion of the lobby near the steps?

"A Yes, sir."

Defendant's counsel renewed his objection on the ground that "there has been no foundation laid with regard to this officer's expertise in trajectory of bullets" and it was "not within the province of this police officer to give that

---

8. Robinson was not called as a witness and appellant had made no effort to locate him.

9. He made no effort to pick up Robinson, who was in a doughnut shop across the street.

10. He explained that this "was to stop him from asking me a whole lot of unnecessary questions because at this time I had never been given a privilege to speak to my attorney".

kind of an opinion, that he is not an expert". In overruling the objection the court·said: "A layman, under certain circumstances, can look at a wall and see whether it appears to come from one direction or another. Certainly this isn't possible if it is straight in * * * You [defense counsel] surely may examine him on his expertise."

On cross-examination Money testified that he was unable to tell what caliber slug caused the hole in the wall and that in his lay opinion there would have been no way to tell what caliber slug had made it. He was cross-examined extensively regarding the hole in the file cabinet,[11] testifying in part:

"Q Now, getting back to the bullet hole in the file cabinet, could you tell where that bullet came from?

"A A lay opinion, yes.

"Q In your lay opinion, where did it come from?

"A Outside the counter area."[12]

Appellant contends that (1) only a qualified expert could testify regarding the trajectory of a bullet; (2) Money's testimony was inadmissible under the opinion rule; and (3) his testimony was highly prejudicial.

■ Expertise as a basis for an opinion is required only when the inferences to be drawn from given facts demand knowledge not generally possessed by the average layman. See McCormick on Evidence, § 13 (1972). The nature of the hole or crease made by a bullet hitting a wall is indicative of the direction from which a bullet was fired. We agree with the district judge that "a layman, under certain circumstances can look at a bullet hole in a wall and see whether it appears to come from one direction or another". No special expertise is required.

Under the so-called opinion rule, the testimony of a lay witness is generally confined to "statements of concrete facts within his own observation, knowledge and recollection, that is, to facts perceived by the use of his own senses as distinguished from his opinions, inferences, impressions or conclusions drawn from such facts". Zimberg v. United States, 142 F.2d 132, 135 (1 Cir. 1944), cert. denied, 323 U.S. 712, 65 S.Ct. 38, 89 L.Ed. 573 (1944). This rule, however, is not strictly followed—due in large part to the difficulty of drawing a fine distinction between fact and opinion. As McCormick suggests, the basis of the opinion rule—that fact and opinion are distinguishable—is an "illusion". McCormick, *supra* at § 11. "There is no conceivable statement however specific, detailed and 'factual,' that is not in some measure the product of inference and reflection as well as observation and memory. . . . The difference between so-called 'fact,' then, and 'opinion' is not a difference between opposites or contrasting absolutes, but a mere difference in degree with no recognizable line to mark the boundary." *Id.* See also Central R. Co. of New Jersey v. Monahan, 11 F.2d 212, 214 (2 Cir. 1926).

■ Given this thin line between fact and opinion, the trial judge should have broad discretion in deciding whether or not to permit opinion testimony. Only a clear abuse of discretion will justify reversing the trial court's admission of opinion evidence. Unitec Corp. v. Beatty Safeway Scaffold Co. of Oregon, 358 F.2d 470, 477–478 (9 Cir. 1966). As Judge Hand commented in Central R. Co. of New Jersey v. Monahan, *supra,* "It is hardly ever reversible error to admit such evidence; its foundation may generally be as conveniently left to cross-examination." 11 F.2d at 214.

■ We find no abuse of discretion on the part of the trial judge. In giving

---

11. The Government had not examined Money regarding the direction from which the bullet was fired into the file cabinet.

12. He testified further that he did not find the lead slug and could not tell what caliber weapon made the hole or crease in the cabinet; that it could have been a .38 caliber weapon or a .32 caliber weapon.

his opinion, Officer Money was merely relating impressions resulting from his observation of the hole in the wall. By indicating the direction from which he thought the bullet was fired, he probably gave the jurors a clearer conception of the nature of the bullet hole than had he attempted to describe the features of the hole. Having observed the bullet hole itself, he would be better qualified than the jury to draw a conclusion regarding the direction from which the bullet was fired.

We conclude also that Money's testimony was not prejudicial. There was substantial evidence that two guns of different caliber had been fired—Williams' .38 caliber revolver and a .32 caliber automatic. Counsel for appellant developed on cross-examination that Money could not tell, and he did not think anyone could tell, what caliber slug had made the bullet hole in the wall. Had the jurors accepted appellant's version of his encounter with Williams, they could have concluded that the bullet hole was made by Williams' gun.[13]

Viewing the evidence as a whole, Money's opinion testimony after cross-examination was of very little probative value.[14] Excluding his testimony, there was substantial evidence to justify the jury verdict. Assuming arguendo that Money's testimony was inadmissible, we conclude that its admission was not prejudicial and that the judgment of conviction should be affirmed. See Rhynard v. Filori, 315 F.2d 176, 178–179 (8 Cir. 1963).

Affirmed.

13. Moreover, although counsel for appellant objected to Money's opinion testimony, he elicited on cross-examination Money's lay opinion that the bullet which entered the filing cabinet was fired from "outside the counter area".

14. Counsel for the Government, in reviewing the Government's case at the beginning of his opening jury argument referred briefly to Money's testimony as tending to show that the bullet hole was not in the line of Williams' firing. The effect of Money's testimony was not otherwise argued by counsel for either party.