Timothy M. ROGERS, Appellant,

v.

UNITED STATES, Appellee.

No. 82–594.

District of Columbia Court of Appeals.

Argued Jan. 10, 1984.

Decided Oct. 2, 1984.

Richard S. Greenlee, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Jr., Public Defender Service, Washington, D.C., at the time the brief was filed, was on the brief for appellant. William J. Mertens, Washington, D.C., appointed by this court, also entered an appearance for appellant. Timothy M. Rogers, filed a brief pro se.

Mary Incontro, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell, Judith Hetherton and William D. Nussbaum, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee. John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, also entered an appearance for appellee.

Before MACK, and ROGERS, Associate Judges, and KERN,[1] Associate Judge, Retired.

MACK, Associate Judge:

After a jury trial, appellant was convicted of second-degree murder while armed (D.C.Code §§ 22–2403, –3202 (1981)), armed robbery (D.C.Code §§ 22–2201, –3202 (1981)), unauthorized use of a vehicle (D.C. Code § 22–2204 (1981)), and carrying a pistol without a license (D.C.Code § 22–3204 (1981)). On April 20, 1982, appellant was sentenced to consecutive terms of imprisonment on each of the four counts of the verdict respectively, as follows: fifteen years to life, five to twenty years, one to five years, and one year. Before this court, appellant raises four allegations of error in support of his argument that his conviction should be reversed and his case remanded for a new trial: (1) statements and physical evidence obtained in violation of his fifth amendment privilege against self-incrimination and as the product of an illegal arrest should have been suppressed, (2) the trial court erred in allowing the prosecutor to cross-examine defense witnesses about appellant's prior involvements with the criminal justice system, (3) his sixth amendment right to present a defense was violated by the trial court's restriction of defense counsel's direct examination of a witness, and (4) the trial court abused its discretion in excluding photographs of the murder scene which precipitated appellant's mental illness. We affirm.

I. Facts

The facts of this case are senseless and horrific. On the morning of May 6, 1980, appellant and his girlfriend Patrice Beckett were riding in appellant's automobile and at about 5:00 a.m. they stopped the car in the 6000 block of Blair Road. Appellant left the car and walked over to a man he did not know who was opening a warehouse gate. After some conversation, they walked over to the man's car, a Cougar, which was parked nearby. As the man opened and reached into his car trunk, appellant shot him in the head and swung his body into the trunk.[2]

Appellant then purportedly forced Beckett into the victim's car and they drove to appellant's house, where he left Beckett while he disposed of the body in Rock Creek Park. When appellant returned, he told Beckett to take the Cougar and go home. Beckett did so but en route she was

---

1. Judge Kern was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

2. Testimony of the deputy medical examiner at trial indicated that the bullet entered behind the victim's left ear and exited from the right side of his face. The victim would have lost consciousness immediately and died approximately twenty minutes after he was shot.

stopped by a police officer, Kelly, for running a red light. The subsequent events leading to appellant's arrest, confession and assistance to the police in locating the victim's body and murder weapon are set forth in the discussion of the pretrial suppression hearing. Appellant's sole defense at trial was that of insanity.[3]

## II. The Suppression Hearing

The following evidence adduced at the suppression hearing is recited in detail due to the seriousness of appellant's challenge to the trial court's denial of his motion to suppress.

Police Officer Kelly testified that on May 6, 1980, at approximately 5:30 a.m., he stopped a Cougar in the vicinity of 5th Street and Missouri Avenue, N.W., after the car passed through a red light. Kelly observed a bloodstain in the rear portion of the car. He asked the driver, Patrice Beckett, to produce a license and registration. She failed to do so, informing Kelly that the car belonged to her boyfriend, Timothy Rogers. Upon Kelly's further inquiry, she said that she was not aware of a bloodstain on the car. She complied with Kelly's request to open the trunk, in which Kelly observed blood and a large caliber shell casing. Kelly placed Beckett under arrest for operating a car without a license and read Beckett her rights. Beckett agreed to answer questions concerning the car. Kelly called the homicide squad, and while awaiting their arrival spoke further with Beckett, who proffered an explanation for the blood in the trunk. She said that she and her boyfriend had gone to a convenience store on Eastern Avenue, N.W., where appellant was approached by an armed robber. Appellant struggled with the robber who was injured when the gun went off.

Kelly further testified that he transported Beckett to the homicide office where he ultimately heard her give another explanation to account for the blood in the trunk. Kelly stated that Beckett told him she and appellant were driving down Blair Road when he pulled the car over and they had an argument. Appellant left the car and approached a man who was opening a gate. A conversation ensued between the two men. They walked over to the rear of the man's car (the Cougar), and the man opened the car trunk. Beckett heard a shot and saw appellant push the man into the trunk.

Another government witness, Detective Williams, testified that he first met Beckett at the homicide office where she initially told him about the attempted robbery and shooting at the convenience store. Williams told Beckett he would have to talk to appellant. Beckett then phoned appellant and told him to come to the homicide office. Appellant, however, called back stating that he had no transportation. Williams then arranged to send a squad car for him. While waiting for appellant to arrive, Williams spoke again to Beckett who related to him the second account of the shooting of a man and the placement of the victim's body in the trunk of the car.

Police Officer Russ testified that he received a radio call at about 8:30 a.m. to pick up appellant at his house on Geranium Street. Russ drove him to the homicide office. Russ did not place appellant under arrest or handcuff him. He testified that appellant was not acting in an unusual manner.

Detective Brooks testified that he met appellant when he arrived at the homicide office, took him into an interview room, and immediately advised him of his rights from a PD 47, the standard rights card, at about 8:50 a.m. Brooks stated that he read appellant his rights because he believed that appellant had already been placed under arrest for unauthorized use of a vehicle.[4]

---

3. To highlight the particularly tragic nature of this case, we note that appellant's insanity defense was predicated upon an asserted mental illness traceable to 1975 when appellant, then a teenager, discovered the gruesomely murdered body of his mother and neighbors.

4. The record belies this fact and indicates, based upon officer Russ' testimony, that appellant had

Appellant responded affirmatively to the questions on the rights card indicating that he understood his rights and would answer questions without having an attorney present. According to Brooks, appellant then signed the PD 47.

Brooks next placed a standard statement form, a PD 118, into a typewriter, and asked appellant about the facts leading up to this incident.[5] Brooks stated that appellant began to talk when "suddenly, he went into a rhyming, jingling conversation." Brooks described the rhyming as poetic, "dealing with religion, about him and the devil and God ... about his assignment here on earth ... and that he had studied cryogenics". Brooks stated that he grew impatient with this rhyming, which lasted five to fifteen minutes, and yelled at appellant saying he did not want to hear any more rhymes. Appellant ceased rhyming and Brooks proceeded to process the PD 118. Appellant provided him with routine information such as his date of birth and address. Brooks then read him the *Miranda* warnings as listed on the PD 118. In response, appellant said he understood his rights, did *not* wish to answer questions, but *was* willing to answer questions without having an attorney present. After Brooks pointed out to appellant the apparent discrepancy between his responses to the PD 47 and the PD 118, appellant stated that he understood his rights and did not want to answer questions about the murder until he talked to a lawyer, but would answer any other questions. Brooks typed on the form that appellant refused to give a statement.

Brooks further testified that he left the interview room to inform his supervisors of appellant's change of mind as reflected on the PD 47 and PD 118. When Brooks returned to the room, he saw that appellant had removed the statement form from the typewriter and was writing on it. He said nothing to appellant. When finished, appellant signed his name, as did Brooks, who gave the statement to his supervisors.[6]

Detective Williams, in addition, testified that while Brooks was in the interview room with appellant, he entered the room several times.[7] He knew that appellant had asserted his right not to answer questions and that appellant had written on the PD 118. Nonetheless, apparently after Brooks had left the room, Williams entered it because he was "curious." Appellant began to talk in rhymes which lasted three to four minutes. According to Williams, appellant stated:[8] "I had to sacrifice him," to which Williams inquired "sacrifice who?" Appellant responded, "the man, the man, the man." Williams asked, "Where is the man?" and appellant said, "he is in the park." Williams next asked, "Where in the park?" to which appellant replied, "by the stables."

Shortly thereafter Williams, Detective Quintrille and other officers went to the park to locate the body. Having no success, Williams called the office to speak to appellant. Appellant spoke with him over

*not* previously been placed under arrest or read his rights.

5. Brooks stated on cross-examination that at the time appellant was brought to the homicide office, he knew only of Beckett's account about an alleged robbery. Brooks, however, had investigated the scene of the alleged incident and found nothing to corroborate her story.

6. Appellant's handwritten statement was as follows:

I Timothy Michael Rogers the First do solemly [sic] swear, to tell the truth about the whole matter concerning something that I, Timothy Michael Rogers the 1 *did not do.*
I also understand that I am going *to be* punished for something I did because I didn't

have a choice, because I, myself was held at gun point along with my girl friend Ms. Patrice Beckett and was made to do something, that I didn't want to do, and upon that token, the police aren't going to believe me. AME.

7. As indicated *supra,* Williams was aware that Beckett had retracted her account of a robbery, and had told Williams that her boyfriend had shot a man and placed him in the trunk. Williams also knew that the owner of the Cougar could not be located.

8. Apparently these words were spoken by appellant and were not part of a rhyme.

the phone, while apparently rhyming, and insisted that the body was there near the stables. Still unable to locate the body, Williams called the office a second time to have appellant brought to the park. Sergeant Wade, who was at the office with appellant, called an Assistant United States Attorney for advice as to whether to take appellant to the scene. The prosecutor told Wade to readvise appellant of his rights. Wade did so at 10:57 a.m., and appellant indicated that he would waive them and signed a second PD 47 card to this effect.

Thereafter, Williams returned to the office to get appellant. Appellant led him to the body in the park. Afterwards, according to Detective Quintrille, appellant said that he would give them the murder weapon, which was at his house on Geranium Street, N.W. Appellant was read a consent to search form and led the detectives to the gun, which was recovered from under his pillow.

At the suppression hearing, appellant called a psychiatrist, Dr. Strathmann, to testify.[9] Dr. Strathmann had interviewed appellant on May 16, 1980, ten days after the murder, to determine his competency to stand trial. He stated that he thought appellant was suffering from a mental illness, a "paranoid psychosis," on the date of the incident. In addition, Dr. Strathmann stated his opinion that, although appellant knew and understood he was talking to policemen, his decision to talk was "largely influenced by a mental disease."

On February 4, 1980, the trial court denied appellant's motion to suppress statements and evidence against him.

### III. Admissibility of Statements and Physical Evidence

Appellant's contention that the trial court erroneously denied his motion to suppress is predicated upon three interrelated bases: (1) that his fifth amendment rights to remain silent and to counsel were violated, (2) that his statements were involuntary in light of his mental condition, and (3) that

his statements and all physical evidence were products of an illegal arrest.

### A. Fifth Amendment Right to Remain Silent and to Counsel

When appellant first arrived at the homicide office, at about 8:50 a.m., Detective Brooks read him his rights from the PD 47 and appellant stated that he would talk about the incident. When Brooks began to take a statement from him at approximately 9:30 a.m., however, appellant, upon being readvised of his rights, said that he did not wish to answer questions but was willing to speak without an attorney present. When pressed by Brooks for an explanation, appellant stated that he understood his rights and did not wish to talk about the murder until he spoke with an attorney. *See supra.* Appellant argues that this assertion of his rights to remain silent and to counsel was contravened when, minutes after Brooks left, Williams entered the room and, in response to appellant's statement "I had to sacrifice him," asked appellant who it was that he had to sacrifice and where the body was. Appellant further contends that even if he "initiated" the conversation with Williams, he did not knowingly and intelligently waive his rights.

Our analysis begins with a review of the trial court's findings.

The trial court's finding on the issue of whether appellant's *Miranda* rights were violated is ambiguous. It appears that the court formulated an "exigent circumstances" exception to *Miranda*, premised upon the fact that the primary duty of the police was to determine whether the victim was dead or alive. According to the court, the need to obtain information to possibly save a life was "sufficient to suspend the prophylactic measures of *Miranda*." The court stated that

if the police knew the decedent was dead ... they should not have asked him what park [he was] talking about.... They should not have asked him that even if he did start talking to them. And there

9. Appellant also recalled Detective Brooks as a defense witness.

isn't any question but that *Jackson* [*v. United States*, 404 A.2d 911 (D.C.1979) ] is against that.

■ We choose not to reach the constitutionality of an exigent circumstances exception to *Miranda,* and similarly do not address whether such an exception might fall within the purview of *New York v. Quarles,* —— U.S. ——, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), even were we to assume *Quarles* to be of retroactive effect. In reviewing a trial court's factual findings on a motion to suppress, the decision as to the validity of a waiver will not be disturbed if supported by substantial evidence. *Hawkins v. United States,* 461 A.2d 1025, 1032 (D.C.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984); *Bliss v. United States,* 445 A.2d 625, 631 (D.C.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983); *Wilson v. United States,* 444 A.2d 25, 29 (D.C.1982). Here, a review of the record reveals no explicit finding by the trial court on the issue of initiation or waiver, although the court did state, in the context of ruling that appellant's confession was voluntary, that appellant had "abandoned ... his constitutional rights for the purpose of doing what he thought he might be able to do in someone else's interest." Although we find the trial court's comments at best ambiguous on this critical point, our review of the record leads us to conclude that appellant did knowingly and intelligently waive his rights.

The nature and permissible scope of contacts between law enforcement officials and an accused were defined nearly twenty years ago in the landmark decision of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in which the Supreme Court held that the prohibition against compelled self-incrimination, contained in the fifth and fourteenth amendments to the United States Constitution, requires that an accused be advised that he has the right to remain silent and the right to have an attorney present *prior* to custodial interrogation. *Id.* 384 U.S. at 479, 86 S.Ct. at 1630. Specifically, the Court stated that if the individual in custody indicates that "he wishes to remain silent, the interrogation must cease," *id.* at 474, 86 S.Ct. at 1627 (footnote omitted), and "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.*

The critical facts in the case at bar implicate the core rationale of *Miranda,* for it is beyond dispute that appellant clearly invoked both his right to counsel and his right to remain silent. To determine whether appellant knowingly and intelligently waived these rights, we focus our attention on two particularly apposite Supreme Court cases, *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), which clarified and expanded upon the principles set forth in *Miranda.*

In *Edwards,* the Court reconfirmed and emphasized that the reinterrogation of an accused in custody who has asserted his right to counsel is inconsistent with *Miranda* and its progeny. 451 U.S. at 485, 101 S.Ct. at 1885. Consequently, the Court held that a valid waiver of the right to have counsel present during custodial interrogation is not satisfied by an accused's response to further interrogation by the police even if the accused is readvised of his rights. *Id.* at 484, 101 S.Ct. at 1884. Rather, the Court held that an accused "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police." *Id.* at 484–85, 101 S.Ct. at 1885.

*Edwards* did not further delineate the contours of the "initiation" requirement. A later decision, *Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (per curiam) provided only minimal clarification of the scope of the requirement, holding that respondent's request for a polygraph examination met the initiation test. *Id.* 459 U.S. at 47, 103 S.Ct. at 396. Elucidation,

however, is provided by the recent plurality decision in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In that case, Justice Rehnquist, in an opinion joined by three other Justices, held that following an assertion of rights the initiation test was satisfied by respondent's question to a police officer, "Well, what is going to happen to me now?" *Id.* 103 S.Ct. at 2835. Justice Rehnquist elaborated:

> Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation.

*Id.* Justice Marshall, in a dissent joined by three other Justices, noted his agreement with the plurality that "to constitute 'initiation' under *Edwards*, an accused's inquiry must demonstrate a desire to discuss the subject matter of the investigation." *Id.* at 2840 (Marshall, J., dissenting). He disagreed, however, with the application of that standard to the case at bar.[10]

■ Applying these guidelines to the facts before us, we hold that appellant "initiated" conversation within the meaning of *Edwards* and *Bradshaw*. Specifically, we view appellant's statement to Williams that "I had to sacrifice him," as expressing a desire to discuss the investigation.[11] Even though it is not entirely clear from the record whether appellant spoke these words while rhyming, we point out that Williams testified that it appeared that appellant was looking at and talking to him. Indeed, appellant's statement is arguably as provocative as the one in *Hawkins v. United States, supra,* where we held that appellant initiated questioning by stating that "he 'wanted to get it off his chest.'" 461 A.2d at 1031–32.

■ Our inquiry does not end with a finding that appellant initiated conversation. The second step of the analysis requires the government to prove a valid waiver of the previously asserted right to have counsel present during interrogation.[12] *Bradshaw, supra,* 103 S.Ct. at 2834–35. The Court in *Edwards* stated:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9. Specifically, we look to the "'particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979) (quoting *Johnson v. Zerbst,* 304 U.S. 458,

---

10. Even given Justice Marshall's statement, we do not automatically conclude that the meaning of "initiation" is indeed the same under both his and Justice Rehnquist's formulation. Justice Powell, concurring in the judgment, points out that there are subtle differences in their views, reflecting the ambiguity of some of the language in *Edwards*. *Bradshaw, supra,* 103 S.Ct. at 2836 (Powell, J., concurring). For present purposes, we need not probe these subtleties in light of the bluntness of appellant's statement. *See infra.*

11. We point out, in addition, that appellant's handwritten statement on the PD 118, *see supra* note 6, also lends support to our finding that appellant initiated communication with the police after he had invoked his rights. We need not decide, however, whether this written exchange alone would satisfy the initiation requirement.

12. The government concedes, as indeed it must, that Williams' questioning of appellant as to whom he had to sacrifice and where the body was located constituted interrogation.

464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)); *see Bradshaw, supra,* 103 S.Ct. at 2835; *Hawkins, supra,* 461 A.2d at 1032.

Turning first to appellant's conduct, there is no doubt that his rhyming was in and of itself bizarre, and its subject matter, referring to a pact with God and the devil, was at best unusual. Still, Brooks testified that when appellant was not rhyming, he was responsive to questions and that there was nothing inappropriate or otherwise strange about his conduct. Williams also stated that appellant appeared to understand his questions and looked at him when he spoke. Moreover, the trial court, noting that appellant did some "unusual things," stated that appellant's behavior may had been prompted by his anxiety and nervousness.[13]

In addition, the record is devoid of any alleged attempts to coerce or trick appellant, and appellant had been in custody but a short period of time. Appellant had had prior contact with the criminal justice system as a juvenile. He showed an awareness of his rights by his waiver of them at the outset and subsequent invocation of them.[14] Furthermore, the trial court indicated that appellant "had a reservoir of intelligence and understanding."

Finally, we emphasize in accordance with *Edwards, supra,* that the fact that appellant initiated the conversation (and wrote on the PD 118) supports a finding of waiver. We have already noted that appellant's statement was not equivocal or vague. As in *Hawkins, supra,* appellant's statement, "I had to sacrifice him," almost solicited inquiry. While we do not hold that the statement of its own force satisfies the waiver requirement, *see Wyrick v. Fields, supra,* 459 U.S. at 48–49, 103 S.Ct. at 396–397, we nonetheless recognize it to be a compelling factor.

■ On the basis of all of these factors, we find that the record supports a knowing and intelligent waiver.

Clearly, our task would be easier had Williams readvised appellant of his rights prior to questioning him.[15] It would certainly be naive to expect that Williams did not hope to obtain some indication as to the whereabouts of the victim who might yet have been alive. The point is, however, that new warnings were not constitutionally mandated given appellant's initiation of discussion about the investigation and the totality of the circumstances. To require new warnings would be "an unjustifiable restriction on reasonable police questioning." *Wyrick v. Fields, supra,* 459 U.S. at 49, 103 S.Ct. at 397. *Edwards* designed a prophylactic rule to protect an accused who has asserted his rights from badgering by police. *Oregon v. Bradshaw, supra,* 103 S.Ct. at 2834. The type of police conduct that the *Edwards* rule was designed to curtail did not occur in this case.

■ For similar reasons, we conclude that appellant's assertion of his right to remain silent was not violated. In *Hawkins, supra,* we recognized that the same standard applies to determine the admissibility of statements after either the right to remain silent or to counsel is asserted. 461 A.2d at 1029. Thus, we look to congruent factors such as 1) whether appellant was advised of and orally acknowledged his rights, 2) whether questioning immediately

13. We reserve for the moment further discussion of appellant's conduct and mental state until our analysis of the issue of voluntariness.

14. It is true that appellant's first responses when readvised of his rights from the PD 118 were contradictory. This fact, however, is of minimal consequence given his ready clarification upon inquiry by Brooks that he did not wish to answer questions about the murder without an attorney present, but would answer other questions.

15. Indeed, in *Oregon v. Bradshaw, supra,* respondent's question as to what would happen to him—a statement, we believe, that was more ambiguous as to the accused's willingness to discuss the investigation than was appellant's statement "I had to sacrifice him"—precipitated a caveat from an officer that respondent did not have to talk to him since he had requested an attorney. 103 S.Ct. at 2835.

ceased, 3) the length of time between interrogations, and 4) whether *Miranda* warnings were again given. *See, e.g., McKeamer v. United States,* 452 A.2d 348, 351 (D.C.1982); *Wilson v. United States, supra,* 444 A.2d at 29; *United States v. Alexander,* 428 A.2d 42, 49 (D.C.1981). We stress again that in the case at bar, appellant was not reinterrogated until after he initiated a conversation. This case, therefore, is unlike *Wilson, supra,* where detectives "persistently and consistently interrogated [appellant] intending to elicit incriminatory statements" at locations "increasingly more coercive." 444 A.2d at 29. This case is also unlike *Alexander, supra,* where a detective admitted that he had made statements to and used "techniques" on appellant designed to elicit inculpatory statements. 428 A.2d at 51. Nor, finally, is it similar to *McKeamer, supra,* where appellant had a low IQ, no prior experience with the criminal justice system, and had invoked her rights at the scene of the crime, but the arresting officer failed to inform investigating police detectives of appellant's prior assertion of rights. 452 A.2d at 351. In the case at bar, Williams knew that appellant had asserted his rights; neither he nor Brooks reinitiated questioning. *See Calaway v. United States,* 408 A.2d 1220, 1225 (D.C.1979); *In re W.B.W.,* 397 A.2d 143, 145–46 (D.C. 1979). In short, appellant's assertion of his right to remain silent was "scrupulously honored." *Miranda, supra,* 384 U.S. at 459, 86 S.Ct. at 1619.

### B. Voluntariness

Appellant contends that his statements were involuntary because there was substantial psychiatric and lay testimony to the effect that he was mentally ill when he made the statements on May 6, 1980. We hold that the trial court's finding that appellant spoke to the police of his own free will and volition is supported by substantial evidence.

The trial court forthrightly acknowledged that the issue of the voluntariness of appellant's statement was a difficult one. It recognized that some of appellant's behavior was bizarre, but questioned whether a mental disease or defect had caused the behavior or whether appellant, whom the court described as both smart and diabolical, was merely acting. The court, after reviewing appellant's juvenile records, was particularly impressed by the fact that appellant had "never before manifested any recognizable symptoms of mental illness or disease." Dr. Strathmann's expert testimony was not conclusively binding on the court and was rebutted by another psychiatric report which was part of the record.

■ The burden rests upon the government to prove, by a preponderance of the evidence, that a confession is voluntary. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). This court has stated that the voluntariness of a confession is assessed by the same factors— *e.g.,* experience with the legal system, allegations of coercion, duration of time between arrest and confession, and circumstances surrounding questioning—taken into account in determining the validity of a waiver. *Bliss v. United States, supra,* 445 A.2d at 631. Our prior consideration of these factors, *see supra,* lends ample support to the trial court's finding of voluntariness.

We do not find *Jackson v. United States, supra,* to be controlling. In that case, appellant had a history of mental illness, his statement was incoherent and elicited after more than four hours in custody, and the detective who interrogated him testified that he thought appellant was mentally ill and needed hospitalization. 404 A.2d at 924.

■ In sum, evidence adduced at the suppression hearing concerning appellant's probable mental state on May 6, 1980 was, at most, ambiguous and conflicting. The trial court was plainly sensitive to this issue and there is substantial evidence to uphold its resolution of it. *See Hawkins, supra,* 461 A.2d at 1032–33.

## C. Probable Cause to Arrest

Appellant finally argues that his statement and all physical evidence should be suppressed as the fruit of an illegal arrest. Citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), he contends that he was arrested without probable cause given the contradictory, unreliable, and uncorroborated information provided by Beckett. The record belies this characterization of Beckett's information and further indicates that there was circumstantial and physical evidence to support a probable cause finding.

▮▮▮ Beckett did not tell the police of the actual shooting on Blair Road until after Officer Russ had gone to bring appellant to the homicide office. But at that point, the police had already determined that the owner of the car could not be located at work or at home, and that the car itself contained a great amount of blood and a large caliber shell casing in the trunk. Moreover, the police had investigated Beckett's account of appellant's shooting of a robber at a convenience store and had found nothing to corroborate her story. Also, Williams testified that he did not believe this account. Therefore, we hold that the trial court's finding of "sufficient evidence from which a reasonable person could conclude that [appellant] committed several offenses, including UUV, robbery, grand larceny and assault" is supported by substantial evidence. That appellant was apparently arrested for unauthorized use of a vehicle and not for homicide, because no body had as yet been found, does not affect the determination of probable cause. *See United States v. Hamilton*, 390 A.2d 449, 451 (D.C.1978).

## IV. Cross-examination Regarding Arrest Record

▮▮▮ At trial, appellant's sole defense was that he was insane at the time the offenses were committed. Appellant contends that the trial court erroneously allowed the prosecutor to cross-examine three defense witnesses (a psychiatrist, a psychologist and appellant's sister) about their knowledge of appellant's arrest record. He argues that these involvements with the law were not relevant to his mental state on May 6, 1980, and instead, proved only a propensity to engage in criminal conduct and had an adverse impact upon the jury. We hold, on the facts of this case, that the cross-examination was proper to impeach the credibility of the witnesses.

▮▮▮ At the close of the government's case, appellant requested the court to preclude use by the prosecutor of information about appellant's arrest record in cross-examining defense witnesses.[16] The trial court denied this request in light of appellant's anticipated insanity defense which, as foreshadowed in appellant's opening statement, would focus upon the murder of appellant's mother in 1975 and appellant's discovery of the body as the precipitating factor of appellant's mental illness. To the extent that the trial court's ruling[17] permitted the introduction of evidence of the arrests to prove that the 1975 event did not

---

16. Appellant's prior criminal involvement, starting at age thirteen, included three arrests prior to 1975, three arrests from 1975 to the date of the instant offense, and two arrests for criminal conduct following this offense while appellant was released on his own recognizance.

17. The trial court stated to counsel at the bench: You can't pick and choose incidents and events, and choose for the defendant's purposes to make the jury aware of these circumstances which have occurred before in the defendant's life that you feel may have an impact or may be helpful in understanding his conduct on the day in question, and somehow be able to keep the government from bringing in other incidents that might tend to show that such conduct as existed on the date in question had existed prior to the incident that has been referred to during the course of the defendant's opening statement, for example.

In other words, one might say if there were criminal conduct of a certain type before 1975, then the 1975 event was not productive of the criminal conduct which is the subject of this case.

itself precipitate criminal conduct, the ruling is erroneous. Such use of the evidence is, in effect, no different from allowing evidence of appellant's evil character to prove criminal disposition and guilt. We agree with appellant that none of these defense witnesses were character witnesses, and the prosecution was therefore not permitted to present evidence of appellant's bad character on the theory that appellant had put his character in issue in the case. *See Michelson v. United States*, 335 U.S. 469, 475–79, 69 S.Ct. 213, 218–20, 93 L.Ed. 168 (1948); *Johns v. United States*, 434 A.2d 463, 468 (D.C.1981). In addition, none of the arrests were sufficiently close in time to the homicide to be admissible as relevant to appellant's mental state in 1980, *see United States v. Davis*, 513 F.2d 319, 321 (5th Cir.1975) (evidence of criminal conduct on same day as charged offense admissible to show defendant is goal-directed and therefore sane), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976); *United States v. Phillips*, 515 F.Supp. 758, 764 (E.D.Ky.1981) (criminal conduct a few weeks prior to charged offense admissible to show state of mind when defense is hypnotic influence). Further, the government does not argue that evidence of these arrests is relevant to appellant's motive or intent on May 6, 1980. *See Drew v. United States*, 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964); *see also United States v. Hauck*, 586 F.2d 1296, 1299 (8th Cir.1978) (past use of insanity defense to evade prior criminal charges admissible to show intent and motive for present assertion of defense), *cert. denied*, 441 U.S. 947, 99 S.Ct. 2170, 60 L.Ed.2d 1050 (1979).

In a case like this one, however, where the defense is not a denial of commission of the act, but the interposition of the affirmative defense of insanity, the prejudice pointed to by appellant, the denial of a "fair opportunity to defend" against the homicide charge, *Michelson, supra*, 335 U.S. at 477–76, 69 S.Ct. at 218, is difficult to identify. In other words, there is no real danger that the jury could use the arrest evidence as proof that appellant committed the murder on May 6, 1980, or to prejudge his guilt on the basis of his past criminal record, because appellant did not deny commission of the act. *Cf. United States v. Caldwell*, 178 U.S.App.D.C. 20, 31, 543 F.2d 1333, 1344 (1974) (where sole defense is insanity, not factual innocence, there can be no prejudice from pretrial publicity in absence of a showing that publicity affected jury's impartiality on insanity issue), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). The likelihood that the jury could use this evidence on such an improper basis was further diminished by the trial court's lengthy instruction to the jury at the outset of the defense case to keep the evidence compartmentalized and to now allow the defense evidence to affect its determination of whether the government had proved all elements of the offense beyond a reasonable doubt.[18]

---

**18.** Specifically, the trial court gave the following instruction:

[A]nything that might come out during the course of [defense] evidence is only offered in relationship to the question of whether the defendant was suffering from mental disease or defect at the time in question in this case.... [I]t may not be used by you in determining whether or not the defendant committed the acts which are the basis for the charges against him. For example, it cannot be used by you in your determination of whether the government has established by evidence beyond a reasonable doubt all of these elements of the offenses that are charged against the defendant. In other words, you must hold what you hear now in that compartment of your brain which is concerned only with the mental capacity of the defendant at the time in question in this case, and not permit it or let it spill over into, or affect that compartment of your brain which is concerned with the question of whether the government has established beyond a reasonable doubt the necessary elements of the offenses with which he is charged; because those are two separate questions, and evidence may be admissible for one purpose and it's proper and legal for one purpose but not proper and legal for another purpose. So you must keep the evidence separate and segregated, and not let one influence your judgment with respect to the other.

In fact, in cases of this type, in which insanity is the sole defense, prior criminal conduct is often part of the *defendant's* case, as tending to show the defendant's inability to conform his conduct to the requirements of law, *see United States v. Emery,* 682 F.2d 493, 500 (5th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 615 (1982); and our cases reflect a concern that prior criminal conduct should not be the *sole* evidence upon which a defense expert bases his conclusion that a defendant was insane at the time he committed the criminal offense. *See, e.g., Bethea v. United States,* 365 A.2d 64, 80–81 (D.C.1976), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977).

While the admission of the arrest evidence in this case resulted in little identifiable prejudice to the defendant, it did have probative value on the issue of the basis for, and reliability of, the opinions proffered by appellant's lay and expert witnesses. As a lay witness, appellant's sister sought to show that she was in a position to make an informed judgment about her brother's mental state. *See Wright v. United States,* 102 U.S.App.D.C. 36, 41–42, 250 F.2d 4, 9–10 (1957). She testified that she was close to him and saw him a few times a week between 1969 and 1980; that appellant was a normal, average teenager; that appellant's discovery of his mother's body in 1975 had a terrible effect on him, and that following the event he "just couldn't do anything, it seemed like"; and that she noticed a more profound change in his personality in the early part of 1980. Yet upon questioning by the prosecution, she denied knowledge of any of appellant's arrests. Use of appellant's arrest record was highly probative on the issue of the accuracy and reliability of Rogers' testimony and was properly admitted to impeach her credibility.

The same is true with regard to testimony of the defense's two expert witnesses. Both experts testified that in order to make a proper diagnosis they needed to know as much as possible about appellant, and that they based their opinions on lengthy interviews with appellant and on his life history as he described it and as described by others in affidavits. The psychiatrist, who had diagnosed appellant as a schizophrenic most likely dating from 1975, testified on cross-examination that he knew something about appellant's arrest record, even though he had not mentioned it in his report. The psychologist testified that he specifically asked appellant about his prior arrest record since it was important to his diagnosis, but had received no information about the bulk of the incidents. In cases such as this one, where both experts based their opinions on the life history of appellant, on cross-examination it is proper to examine that history "in some detail. This is as it should be.... [T]he material from which an expert fashions his opinion constitutes one of the most important features ... of expert testimony." *Martin v. United States,* 109 U.S.App.D.C. 83, 84, 284 F.2d 217, 218 (1960) (evidence of defendant's prior bad acts and trouble with police admitted). *See also Doepel v. United States,* 434 A.2d 449, 455 (D.C.), *cert. denied,* 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981) (where defense is insanity, evidence of prior criminal conduct relevant to show psychiatrist's opinion contrary to that suggested by conduct); *United States v. Emery, supra,* 682 F.2d at 498 (where defense is insanity, evidence of prior criminal conduct relevant when psychiatrist's opinion rests partially on that conduct).

In *United States v. Ruster,* 712 F.2d 409 (9th Cir.1983), the sole issue for the jury to determine, as in this case, was whether the defendant was sane at the time the offense was committed. In that case the Ninth Circuit held that it was not error to admit evidence of the defendant's arrest record upon cross-examination by the prosecution of defendant's expert psychiatrist. When insanity is presented as a defense, the court said, "the trial judge should be free in his admission of all possibly relevant evidence." 712 F.2d at 412. We hold that

in this fact situation, the probative value of the arrest evidence in testing the foundations for the lay and expert testimony, and in impeaching the credibility of these witnesses, outweighs any prejudicial effect its introduction may have had upon the jury's determination.

The fact that several of the charges against appellant ultimately were dropped does not affect this conclusion, for in its final charge to the jury, the trial court stated:

> Now during the course of the trial evidence has been introduced from time to time that the defendant has had other criminal charges alleged against him. Now, merely because criminal charges are brought does not establish that the defendant committed those offenses. You may evaluate any reference to any such criminal charges in light of all other evidence in the case, and then give it such weight as in your judgment it is fairly and objectively and impartially entitled to receive.

■ Viewed as a whole, these instructions comport with defense counsel's request for a cautionary instruction that the evidence of prior arrests not be considered as proof of commission of the offense charged.

In sum, we hold that the trial court did not abuse its discretion in allowing cross-examination of defense witnesses about appellant's arrest record. *See Staton v. United States*, 466 A.2d 1245, 1249 (D.C. 1983).[19]

### V. The Right to Present a Defense

Relying upon *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) and *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), appellant next asserts that his constitution-

al right to present a defense was violated by the trial court's ruling that defense counsel could not elicit testimony from Patrice Beckett to lay a foundation that appellant's behavior on May 6, 1980 was dissimilar to behavior she had observed while he was under the influence of PCP. He argues that such testimony was vital to his insanity defense, since it would have helped to convince the jury that a mental illness, not a drug, caused him to commit the homicide. We find no error in the trial court's curtailment of Beckett's testimony.

At trial, defense counsel recalled Beckett as a witness for the defense. In response to questions, Beckett stated that she and appellant had smoked marijuana and PCP at times since they began seeing one another in September, 1979, and that she could tell whether he was high.[20] The prosecutor objected, however, when defense counsel sought to have Beckett respond to the question of whether PCP caused appellant to be violent, and whether appellant's behavior on May 6, 1980 was of the sort she had seen after he smoked PCP. These objections were sustained, and the court ruled that defense counsel could not ask Beckett to give her opinion as to whether appellant's behavior on the critical date was caused by PCP or was dissimilar to behavior she had observed after he used PCP.

Under District of Columbia law, lay witnesses may give an opinion about the mental condition of an individual based upon their own observations. *Riley v. United States*, 291 A.2d 190, 193 (D.C.1972); *Naples v. United States*, 120 U.S.App.D.C. 123, 130, 344 F.2d 508, 515 (1964); *De Bruin v. De Bruin*, 90 U.S.App.D.C. 236, 237, 195 F.2d 763, 764 (1952). Still, as a general matter, a lay witness' testimony

---

**19.** We do not reach the question of whether the government's use of prior juvenile arrests violated the general principle that such matters are confidential. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Tabron v. United States*, 444 A.2d 942 (D.C.1982). Any such error is harmless on this record.

**20.** On cross-examination, Beckett said that from the evening of May 5th through the morning of May 6th, she did not observe appellant take any drugs, though she added that appellant did leave the room while they were at another person's house.

relates *facts* derived from his own knowledge and observation, not opinions and conclusions drawn from the facts. *United States v. Pierson*, 164 U.S.App.D.C. 82, 85, 503 F.2d 173, 176 (1974). Recognizing the thin line between facts and opinion, however, the circuit court in *Pierson, supra*, noted that it accords the trial court broad discretion to determine whether to permit opinion testimony. *Id.* 164 U.S.App.D.C. at 85, 503 F.2d at 176.

■ In the case at bar, we doubt the propriety of defense counsel's questions to Beckett as to a possible causal relationship between appellant's acts and the use of PCP, even under *Riley, Naples*, and *De Bruin, supra*. In any event, the trial court did not err in disallowing testimony in response to counsel's questions on these specific matters. The court fully permitted questioning as to appellant's conduct and behavior both at times after he had taken PCP and on May 6, 1980; beyond this point, the court could properly rule that it was incumbent upon the jury to draw its own conclusions.

Indeed, upon review of the record we are in agreement with the government that defense counsel, despite objections by the prosecutor, successfully elicited the very testimony he sought. A fair reading of the record shows that in response to questions, Beckett described appellant's behavior in circumstances after he had taken PCP. She also stated that appellant's violent behavior was not necessarily associated with PCP and that she did not view his behavior on May 6, 1980 to be similar to the behavior she had observed at times after he had taken PCP.[21] Moreover, Beckett clearly testified that in the instances in which appellant had acted violently after taking PCP, he would have been violent even if not under the influence of the drug. In short, there is no merit to appellant's contention that the trial court's ruling violated his right to present a defense. The jury could have concluded, on the basis of Beckett's testimony, that drugs did not precipitate appellant's violent behavior on May 6, 1980.

## VI. Exclusion of Photographic Evidence

Lastly, appellant contends that the trial court abused its discretion in denying his request to admit photographs of the death scene in 1975 involving his mother. Given the theory of his defense, that his mental illness stemmed from his discovery of his mother's body in addition to the bodies of other neighbors, appellant reiterates his earlier argument that exclusion of the photographs violated his constitutional right to present a defense.

■ It is well settled that "[t]he determination [ ] to admit photographs as demonstrative evidence is within the trial court's sound discretion." *Brown v. United States*, 464 A.2d 120, 123 (D.C.1983) (citation omitted); *see Faunteroy v. United States*, 413 A.2d 1294, 1299 (D.C.1980);

---

**21.** The following testimony appears in the record:

> Defense Counsel: When Timothy acted violent, if Timmy acted violent, was that during a time you associated with his being high on PCP or not?
> Prosecutor: Objection, Your Honor.
> Beckett: No.

The following exchange occurred later when defense counsel directed Beckett to focus on the morning of May 6, 1980 when appellant exited the car at Blair Road and approached the victim.

> Defense Counsel: Did you see his behavior?
> Beckett: When Timothy got out of the car he was calm. He had just calmed down, in fact.
> Q. Okay. And when he came back to the car?

> A. He was—when he came back to the car he was half-and-half.
> Q. I'm sorry?
> A. Half-agitated and—he was calm, but was leaning toward agitation.
> Q. Now, you were familiar with Timothy Rogers' calm state, right?
> A. Yes.
> Q. And you were familiar with Timothy Rogers when agitated, right?
> A. Yes.
> Q. Is it your testimony today, here under oath, that that was behavior you had seen after Timothy Rogers had smoked PCP?
> A. No. I'm saying that—

This last response by Beckett was cut off prior to clarification.

*March v. United States*, 362 A.2d 691, 704 (D.C.1976). The record demonstrates that the trial court carefully weighed the probative value of the photographs against their prejudicial effect and ruled that they were "unnecessarily prejudicial" because they were "absolutely too gory." We find no abuse of discretion in this ruling.[22] Moreover, one of appellant's witnesses had described the murder scene in detail. Given this testimony, there is no merit to appellant's argument that his right to present a defense was violated.

*Affirmed.*

22. Indeed, the trial court had previously exercised such discretion in excluding one of the photographs tendered by the government due to its prejudicial effect.